[No. 43187.    En Banc.    September 26, 1974.]

NARROWSVIEW PRESERVATION ASSOCIATION *et al., Appellants,*
v. THE CITY OF TACOMA *et al., Respondents.*

*Binns, Petrich, Mason, Hester & Robson,* by *James J. Mason,* for appellants.

*Quinby R. Bingham, Mann, Copeland, King, Anderson, Bingham & Scraggin, Robert R. Hamilton, F. H. Chapin, Jr.,* and *William J. Barker,* for respondents.

UTTER, J.—The Narrowsview Preservation Association and William M. Douge on his own behalf and on behalf of a class similarly situated, brought a writ of certiorari before the Superior Court. They sought to review the actions of the planning commission and city council of the City of Tacoma who had adopted an ordinance which rezoned an 89-acre tract. The rezone was from single-family dwelling to planned residential development. The Superior Court upheld the validity of the amendment to the zoning ordinances of the City of Tacoma.

The issues raised by Narrowsview on appeal are whether the zoning ordinance amendment constituted illegal spot zoning, whether there was a conflict of interest by one or more members of the planning commission and city council resulting in a violation of the appearance of fairness

doctrine, whether the City failed to comply with the requirements of the State Environmental Policy Act of 1971, requiring an environmental impact statement in major actions significantly affecting the environment, and whether the City improperly failed to require a shoreline development permit from the developer.

We find there was a violation of the appearance of fairness doctrine and reverse the trial court.

The tract in question is 89 generally unimproved acres sloping down toward the Tacoma Narrows. A portion of it is within 200 feet of Puget Sound although a railroad line runs between the Sound and the upper portion of the property. Forty-five acres of the tract are owned by Sydney C. Selden and Selden's, Inc., a wholly owned family corporation. The remaining 44 acres are owned by Thomas W. Anderson, as trustee for members of his family, and by members of a Barnett family. In 1972, respondents filed their application to have the property rezoned to a planned residential development to allow them to build approximately 1,100 apartment units in 3-story structures. The city planning commission approved the petition by a vote of 4 to 3 and this action was later affirmed by a unanimous vote of the city council in adopting the challenged ordinance. Two of the four affirmative votes cast at the planning commission were voted by Mr. Nathaniel Green and Mr. Phillip Schroeder.

Appellants allege the appearance of fairness doctrine was violated insofar as Mr. Green was involved, by virtue of the fact that the property owned by Sydney C. Selden and Selden's, Inc., was pledged to the bank Mr. Green was employed by to secure a large indebtedness of Selden's, Inc. The property is subject to first and second mortgages of $547,000. The indebtedness was past due and interest was accumulating on it. At the trial, the only security shown to be held by the bank to secure that indebtedness was the rezoned property. There was testimony that Selden's, Inc., last showed a profit in 1969. After trial, but prior to entry of judgment, Selden's, Inc., filed a petition of bankruptcy

under chapter 11 of the Bankruptcy Act. 11 U.S.C. § 701 *et seq.* (1970).

Prior to rezone, testimony placed the value of the subject tract at $8,000 an acre with the rezone increasing the value to $17,000 per acre. The latter figure is the figure which the property was agreed to be sold for if the rezone were accomplished. The effect of the rezone was to more than double the value of the bank's collateral for the delinquent indebtedness.

The vice-chairman of the City of Tacoma Planning Commission, Mr. Green, was a loan officer of the Pacific National Bank of Washington. The bank was aware of Mr. Green's position on the planning commission, and, prior to voting, Mr. Green had inspected the property. The bank also knew that the property was owned by Sydney Selden, that Selden's, Inc., was an account of the bank, and that the rezone would increase the value of the property. Mr. Green testified he did not identify the Sydney Selden, who owned the property, with Selden's, Inc., at the time he voted.

The court found that Mr. Green was not an officer of the bank at the time the application for the rezoning was submitted to the planning commission of the City of Tacoma and was not in a policy-making position with the bank at the time of the proceedings here involved. It further found that none of the members of the council or the planning commission of the City of Tacoma were shown to have an interest whereby they would benefit by either granting or denying the petition for rezoning in this case. The court therefore concluded that the hearings involved did not lack an appearance of fairness.

The record shows that Mr. Green's position with the bank did not involve him in decisions regarding the Selden account. His only acquaintance with that account was an awareness that there was a loan account maintained by Selden stores with the bank and an occasional delivery of loan files to credit officers of the bank. His primary duties were as a credit researcher and a loan interviewer at various branches of the bank with authority to make personal

loans up to $1,000 only. Mr. Green left the employment of the bank in January of 1973 to enter the retail grocery business and had started negotiations for purchase of this business in August of 1972, prior to the planning commission hearing. The funds for purchase of his grocery business were obtained from another bank in the Tacoma area after Pacific National Bank denied his request.

The record does reveal that one of the owners of a portion of the rezoned property, Mr. Thomas Anderson, was at the time of rezoning, a director of Pacific National Bank of Washington, but further reflects that Mr. Green was unaware of this fact and had never met Mr. Anderson.

▆▆▆ The development of the appearance of fairness doctrine in this state is closely tied to our recognition that restrictions on the free and unhampered use of property imposed by planning and zoning compel the highest public confidence in governmental processes bringing about such action. Members of commissions with the role of conducting fair and impartial fact-finding hearings must, as far as practical, be open-minded, objective, impartial, free of entangling influences, capable of hearing the weak voices as well as the strong and must also give the appearance of impartiality. *Buell v. Bremerton,* 80 Wn.2d 518, 523, 495 P.2d 1358 (1972). The doctrine is applicable to show an interest which might have substantially influenced a member of the commission even if that interest did not actually affect him.

While the findings of fact make it clear Mr. Green would not personally benefit from either the granting or denial of the petition for rezone, the equally undeniable major benefit to his employer from the approval of this rezone brings this case squarely within the holding in *Buell.* Mr. Green recognized the apparent conflict. He stated that had he known the Seldens who were involved in the rezone were the same Seldens who had an account with the bank and owned the store, or that the Thomas W. Anderson involved in the rezone was the same Thomas W. Anderson who was a bank director, he would have disqualified himself. It must

be stressed that there is no evidence or inference that either the bank or Mr. Anderson applied any improper pressure of any nature on Mr. Green. It is the appearance to those affected, however, that is determinative under these facts.

■ Complaint was further made that the presence of Mr. Phillip A. Schroeder on the planning commission as a representative of the city council violated the appearance of fairness doctrine. Mr. Schroeder voted adversely to appellants and for the rezone as a planning commission member and also again as a member of the city council. The facts show that Mr. Schroeder had at one time worked for the Seldens but was now engaged in his own business of carpet, rug and furniture cleaning. He had customers who were members of appellant-Narrowsview Preservation Association and had many customers among the several hundred residents who signed the petitions of appellants. A mere acquaintance with, or casual business dealings in a minimal sense with the Seldens, would not be of such a nature that we could say, absent a finding of fact to the contrary, that Mr. Schroeder could not both in fact and appearance be open-minded, objective, impartial and free of entangling influences.

■ Appellants urge the change in zone from R-1, single-family residence, to R-3, planned residential development, constituted spot zoning and was, therefore, illegal. We have recently stated that illegal spot zoning is arbitrary and unreasonable zoning action by which a smaller area is singled out of a larger area or district and specially zoned for use classification totally different from and inconsistent with the classification of the surrounding land, not in accordance with the comprehensive plan. *Smith v. Skagit County*, 75 Wn.2d 715, 743, 453 P.2d 832 (1969); *Lutz v. Longview*, 83 Wn.2d 566, 573, 520 P.2d 1374 (1974). We noted in *Lutz*, at page 575, that enactment of zoning regulations is "a discretionary exercise of police power by the legislative authority of the city and cannot be reviewed by the courts except for manifest abuse of discretion, which is

usually characterized as 'arbitrary and capricious conduct.' "
Although there was serious disagreement as to whether it
was wise for the City to rezone, the recommendation of the
planning commission noted that the rezone would allow
more open space and recreation areas, that the zoning
would not have a substantially greater impact on the sur-
rounding area than development of the property under the
present R-1 single-family classification, that the population
density of the area would remain about the same and that a
single-family residence subdivision was bordered on 3 sides
by the site in question and had numerous lots remaining
vacant and some homes unoccupied. This showing fails to
disclose conduct of the kind that can be described as arbi-
trary and capricious, and the contention that there was
"spot zoning" is without merit.

Appellants next contend the City of Tacoma failed to act
in accordance with the State Environmental Policy Act of
1971, RCW 43.21C, which requires cities and other public
agencies to include an environmental impact statement in
every major action significantly affecting the environment.
The City of Tacoma has indicated that it does not, as to the
rezoning, intend to prepare nor require the developer to
furnish an environmental impact statement in connection
with the rezone. This does not mean that the City failed to
consider the environmental impact of this proposed rezon-
ing.

Comments were solicited from and obtained by the plan-
ning commission personnel regarding the environmental
impact of the proposed rezoning from the Tacoma health
department, metropolitan park district, fire department,
public works department, light division, water division,
public schools and the Washington State Highway Commis-
sion and Department of Agriculture. In addition, reports
were obtained from Geolabs, foundation and soils engineers
concerning the suitability of the project in connection with
the soils upon which the construction would be located.
Public hearings were held for the benefit of the affected

public to obtain objections to the possibility of increased traffic from construction of apartments in the area.

The court specifically found that "the Planning Commission investigated the environmental factors which were required to be considered under the State Environmental Act . . ." The planning commission concluded "the development as proposed under the R-3 PRD zoning would not have a substantially greater impact on the surrounding area than development of property under its present R-1 one-family classification."

The factual determination by the City was to the effect that the action in rezoning would not significantly affect the environment in that it would not impact the area to any greater degree than the existing zoning. The use of the term "significantly" has been defined to include the examination of at least two relevant factors: (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area. *Hanly v. Kleindienst,* 471 F.2d 823, 828 (2d Cir. 1972). Here, the determination by the City would seem to have negatived a finding that the impact was "significant" as defined in *Hanly.* The trial court found that the rezoning would not have a substantial impact on the environment and that the determination was supported by evidence in the record.

The administrative decision of the city government would not appear to have been arbitrary and capricious under any standard we have previously announced. There was a careful consideration of the environmental impact, numerous affected agencies were contacted for opinions and a full public hearing was held. There was, as well, substantial evidence to support the administrative decision. *Deaconess Hosp. v. State Highway Comm'n,* 66 Wn.2d 378, 403 P.2d 54 (1965); *State ex rel. Perry v. Seattle,* 69 Wn.2d 816, 420 P.2d 704 (1966).

It is entirely consistent for government to determine that a change in the zoning would not have a substantial impact on the environment, based upon the information available, when examined in relation to those uses already allowed by existing zoning and yet to require an environmental impact statement at such time as a preliminary plat or building permit was issued for a specific project when details of the specific structure and use of the property are more clearly defined. *See Eastlake Community Council v. Roanoke Associates, Inc.,* 82 Wn.2d 475, 513 P.2d 36 (1973); *Loveless v. Yantis,* 82 Wn.2d 754, 513 P.2d 1023 (1973).

■ Appellants' final contention on the merits is that the Shoreline Management Act of 1971, RCW 90.58, was violated inasmuch as the City failed to require the developer to seek a shoreline development permit. We cannot agree that the act requires a permit at this stage. The reclassification of an area plan to a planned residential development does not have the effect of authorizing construction upon the property involved. Subsequent to such a reclassification, application will be made with the planning commission for site approval for all or any portion of the proposed develpment. The act of rezoning does not involve any physical alteration of the land or irrevocable commitment to allow such a physical alteration. RCW 90.58.030(3)(d).[1]

RCW 90.58.140(2) defines "development" as follows: "No substantial development shall be undertaken on shorelines of the state without first obtaining a permit from the government entity having administrative jurisdiction under this chapter." RCW 90.58.030(3)(e) defines "substantial development" as meaning "any development of which the

---

[1]RCW 90.58.030(3)(d):

" 'Development' means a use consisting of the contruction or exterior alteration of structures; dredging; drilling; dumping; filling; removal of any sand, gravel or minerals; bulkheading; driving of piling; placing of obstructions; or any project of a permanent or temporary nature which interferes with the normal public use of the surface of the waters overlying lands subject to this chapter at any state of water level;"

total cost or fair market value exceeds one thousand dollars, or any development which materially interferes with the normal public use of the water or shorelines of the state . . ." Here, unlike the facts of *Merkel v. Port of Brownsville,* 8 Wn. App. 844, 509 P.2d 390 (1973), there is no commencement of construction to prejudice subsequent decisionmaking or any other acts which would allow specific physical improvements being made on the land within 200 feet of the shoreline.

Respondents finally argue that the appeal should be dismissed in its entirety inasmuch as notice of appeal was given prior to the time of the actual filing and entry of judgment. This appeal was initially filed with the Court of Appeals, and CAROA 33(1) states that for the Court of Appeals to obtain jurisdiction a written notice of appeal must be filed with the Clerk of the Superior Court "within thirty days after entry of the order, judgment, or decree from which the appeal is taken . . ." In this case, affidavits on file indicate the court, on May 14, 1973, signed findings of fact, conclusions of law and judgment and at the conclusion of the hearing delivered the file and the signed judgment to an employee of the clerk's office. The county clerk found the judgment loose in his file on June 19, 1973; however, they were not stamped and a docket entry had not been made as of that date. Notice of appeal was filed on May 23. An affidavit of the deputy clerk assigned to the case indicated that, although he did not specifically recall filing the papers, it was his invariable practice after the signing of a judgment and delivery to him of such papers by the court, to lodge them in the clerk's office for filing the same day. He stated he had no reason to believe any different practice was followed in this case.

We have held that a notice of appeal is premature if it is filed prior to entry of judgment. *Glass v. Windsor Nav. Co.,* 81 Wn.2d 726, 504 P.2d 1135 (1973). Subsequently, in *Malott v. Randall,* 83 Wn.2d 259, 517 P.2d 605 (1974), we held that a judgment was not entered under CR 58 until it was physically lodged in the office of the clerk. We there

noted, at page 263, "Our holding is a very narrow one confined to the facts which hopefully are unique and unlikely to occur again. Yet, if we held otherwise, this litigant would be deprived of his right to appeal because of an unfortunate set of misadventures which merely reflect the fact that human beings conduct the daily routines of the administration of justice." The affidavits in this case indicate that, although the judgment was not stamped and a docket entry made until June 19, 1973, they were physically in the clerk's file and lodged in his office on May 14 and that, more importantly, all counsel in the proceedings were aware the judgment was signed and placed in the file on that date. We believe this distinguishes this case from our holding in *Malott v. Randall, supra,* and the cases relied on therein and hold that the notice of appeal was filed pursuant to court rule, subsequent to entry of judgment.

The judgment of the trial court is reversed.

HALE, C.J., and ROSELLINI, HUNTER, HAMILTON, STAFFORD, WRIGHT, and BRACHTENBACH, JJ., concur.

Petition for rehearing denied December 17, 1974.