[No. 4101–II.   Division Two.   June 23, 1981.]

WASHINGTON MEDICAL DISCIPLINARY BOARD, *Respondent,*
v. JAMES C. JOHNSTON, *Appellant.*

*G. Cliff Armstrong,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *John Keith, Assistant,* for respondent.

PETRIE, A.C.J.—Dr. James Johnston appeals an order of the Superior Court for Thurston County denying his petition seeking to reverse the Washington State Medical Disciplinary Board's decision to revoke his license to practice medicine. We reverse.

From 1973 to 1976 Dr. Johnston conducted a "preventive medicine" practice in Bellevue. Johnston described his practice as

specializing and focusing on helping people to prevent the crises, to reverse the causes of illness, which you can do intelligently with exercise and fresh air and nutrition and use as few drugs as possible, because the drugs are usually symptomatic rather than curative.

Part of his practice involved the use of "natural remedies" as a program of treatment. The charges that ultimately resulted in the revocation of Johnston's license to practice medicine stem from his treatment of two patients, Robert Hendrickson and Marcella Moore, and his employment of Remigio Peralta. What follows is a summary of the facts underlying Johnston's involvement with Hendrickson, Moore, and Peralta.

Robert Hendrickson: In early July 1976 Hendrickson, complaining of a large blister on his abdomen, telephoned Johnston, who had been his doctor since May of that year. On July 10 Johnston went to Hendrickson's home, where he found Hendrickson critically ill. Johnston later testified that at this point he insisted that Hendrickson be hospitalized and that certain diagnostic tests be performed, but that Hendrickson, who distrusted hospitals and the medical profession, adamantly refused. Only then, claims Johnston, did he prescribe "natural remedies." Hendrickson's widow, testifying on behalf of Johnston, stated that Johnston told Hendrickson that hospitalization was "the best deal" but that a program of natural remedies would succeed. The program Johnston prescribed included herbal tea enemas, a liquid diet, and periods of fasting.

By early August Hendrickson had lost a great deal of weight and remained critically ill. An abdominal wall abscess developed, which Johnston treated by suturing.[1] After several more office visits Johnston referred Hendrickson to Dr. Robert Mack. Mack discovered a large abdominal wall defect and admitted Hendrickson to Swedish Hospital on August 10. Mack's initial diagnosis was that Hendrickson's abdominal condition resulted from a cancer-

---

[1] Johnston testified that this abscess was in fact a sterile ulcer.

ous growth. This diagnosis was subsequently confirmed by the examination of tissue removed during exploratory surgery.

In the hospital Hendrickson developed pneumonia and "acute renal failure." His condition continued to deteriorate, and on August 25 he died. Mack's final diagnosis listed three causes of death: (1) cancer of the colon; (2) respiratory failure caused by pneumonia; and (3) renal failure caused by shock.

<u>Marcella Moore</u>: Moore, like Hendrickson, had a strong aversion to the medical profession. She had been seeing Johnston "on and off" since 1974. In June 1976 Johnston and Moore decided to begin a treatment program based on the "Gerson diet."[2] In addition to the diet Johnston also prescribed six additional medications. Apparently, however, Moore, who was inclined toward self-medication, refused to take several of the additional medications.

On November 3, 1976 Johnston visited Moore at the home of Dave and Carolyn McCormack, where Moore was living. He found her seriously ill and diagnosed the problem as gallstones. Johnston recommended that she be hospitalized, but she refused, believing the Gerson program would be successful. Johnston spent the night caring for Moore, his treatment consisting mainly of coffee enemas and oral medication. Sometime during the night, according to Johnston, Moore passed several gallstones.[3]

The following morning Johnston left Moore in the care of Dave McCormack. According to Johnston, he told McCor-

---

[2]Johnston described the Gerson diet as: "[I]ntensive nutrition in the form of juices, vegetable juices, fruit juices, it's a low salt diet with additional potassium supplements, thyroid and Lugol's solution are a very important part of it . . . it's not a specific treatment . . . it's a way of restoring the body's healing power and it takes a lot of time and energy . . ."

[3]Dr. Paul Sandstrom, who subsequently treated Moore, testified that he had never heard of such a course of treatment for gallstones. Dr. Donald Reay, the county medical examiner who performed an autopsy on Moore, testified that while it was conceivable that Moore had had gallstones, he found no evidence at the time of the autopsy that she had passed any gallstones.

mack to give Moore two more enemas and call him if there was any change in her condition. McCormack testified that Johnston instructed him to have Moore eat and drink something, take her off the enemas, have her sleep 6 to 8 hours, and then continue the enemas if she felt up to it.

Later that day Moore felt better and insisted on continuing the coffee enemas. At 7:30 p.m. she had a seizure. McCormack called Johnston and was told that continuing the enemas would be the "worst thing" possible. Despite these instructions Moore insisted that the enemas continue. Approximately 10 more enemas, apparently of a much stronger concentration than Johnston had prescribed, were administered over the next 10 hours. Moore also suffered several more seizures, the final one coming at approximately 5:45 the next morning. At this point McCormack called Johnston again, who told him to call an ambulance.

Moore was admitted to Evergreen Memorial Hospital, where Dr. Paul Sandstrom became her attending physician. On admission she was comatose and in "severe electrolyte imbalance" due to the excessive administration of the coffee enemas.[4] Moore died 12 days after admission. The autopsy report stated the cause of death as "the administration of large volumes of fluid by enema."

Remigio Peralta: In 1975 Johnston employed Peralta, who worked in Johnston's laboratory, served as a massage therapist, and assisted in the delivery of babies. Although Johnston was aware that Peralta was not licensed to practice medicine in Washington, Peralta had completed 3½ years of medical school at the University of Washington and had a degree in naturopathy from Bernadean University in Las Vegas. He also had applied in Washington for a license in midwifery.

In October 1975 Mr. and Mrs. Kenneth Solheim, who were expecting a child and wanted a home delivery, were referred to Johnston's clinic. They met with Peralta, who

---

[4] Dr. Sandstrom testified that on admission the amount of caffeine in Moore had reached toxic levels.

they were told was a doctor. Peralta examined Mrs. Solheim and told the couple that he would deliver the baby. Approximately 1 week later Peralta delivered the baby, unassisted, performing such surgical procedures as cutting the umbilical cord. Despite never having met the Solheims, Johnston signed the birth certificate.

Johnston's activities were first brought to the Board's attention in September 1976 when Mack wrote a letter to the Disciplinary Board complaining about Johnston's treatment of Hendrickson. On September 25 the Board met and reviewed Mack's letter and an investigative report received from the Division of Professional Licensing. The Board then instructed John Keith, the assistant attorney general assigned to the Disciplinary Board, to schedule a formal hearing regarding charges of aiding and abetting an unlicensed person to practice medicine, unsafe practices, and gross incompetency.

During October and November the investigation continued. No hearing was scheduled nor formal statement of charges prepared, however, partly because Johnston was out of the state for approximately 1 month. In early December the Board received a complaint from Sandstrom regarding Johnston's treatment of Moore. This complaint was forwarded to Dr. Richard Diefendorf, a member of the Board, who instructed Keith to contact Dr. Carrold Iverson, Chairman of the Board, in order to draw up a "summary suspension" of Johnston's license. An order of summary suspension was signed by Iverson on December 7 and served on Johnston. At approximately the same time the Board filed a formal statement of charges, charging Johnston with "gross incompetency in the practice of medicine" because of his treatment of Hendrickson and Moore.

On January 15, 1977 the Board conducted a preliminary hearing regarding the summary suspension. At this hearing Johnston's attorney urged the Board to lift the suspension; the Board, however, concluded that insufficient evidence had been presented to justify such an action. On February 1, an additional charge was filed against Johnston, alleging

that he had aided and abetted the unlicensed practice of medicine through his employment of Peralta.

A second hearing regarding the suspension was conducted on February 11 before a 3–member hearing committee. At this hearing Johnston's attorney challenged the Board members on the grounds they had prejudged the case against Johnston. Based partly on these concerns a stipulation was proposed whereby a hearing would be conducted on March 18 before a quorum of the Board with a hearing examiner present to preside over the hearing. From the hearing findings of fact would be presented to the full Board, which would issue conclusions of law. Also, the suspension would be lifted on the condition that Johnston practice only in association with a physician acceptable to the Board. This proposal was presented the same day to the entire Board; it agreed to a temporary stay of the suspension, but rejected the idea of having a hearing examiner present, deciding instead that the full Board would hear the case.

Because of a death in Johnston's family, the March 18 hearing was continued until April 15. The temporary stay, however, was revoked and the suspension reinstated. On April 15 the first evidentiary hearing was held before the full Board. At this hearing Johnston was represented by new attorneys who had been retained 2 weeks prior to the hearing. Johnston's attorneys moved for a 2–month continuance, based on their lack of adequate time to prepare. The Board reserved ruling until after Keith had presented the Board's witnesses. The Board heard testimony from Mack, Sandstrom, the Solheims, and Dr. Donald Reay, the county medical examiner. Each of these witnesses was cross–examined by Johnston's attorneys. At the conclusion of this testimony the Board granted a 60–day continuance.

On June 17 the hearing was reconvened with one member of the Board, a Dr. Hunter, not present. Johnston testified regarding his treatment of Hendrickson and Moore and was examined extensively by Keith and the members of the Board. In addition, Hendrickson's widow and Dave McCor-

mack testified on behalf of Johnston. At the conclusion of all the testimony the Board adjourned, determining that further consideration of the evidence was necessary.

On July 6 the Board entered its findings and conclusions.[5] It found that Johnston's treatment of Hendrickson and Moore constituted gross incompetence and that his employment of Peralta aided and abetted the unauthorized practice of medicine. Based on these findings and conclusions, the Board revoked Johnston's license to practice medicine. Johnston petitioned the Superior Court for Thurston County for review of the Board's decision. After reviewing the entire record, the Superior Court denied the petition. Johnston now appeals.

On appeal, Johnston basically questions first, the procedures followed by the Disciplinary Board; and second, the sufficiency of the evidence relied on by the Board to revoke his license. In contesting the procedures followed by the Board, Johnston contends that the procedures violated (1) due process, (2) the Washington administrative procedures act (APA), RCW 34.04, and (3) the appearance of fairness doctrine. While we do not believe the Board's procedures violated either due process or the APA, we do believe the Board's actions violated the appearance of fairness doctrine.[6]

In contending that the Disciplinary Board violated due process, Johnston argues that the Board impermissibly acted as investigator, prosecutor, and judge against him. This combination of functions, according to Johnston, deprived him of a fair and impartial hearing. *See generally* 3 K. Davis, *Administrative Law* § 18 (2d ed. 1980). In response the Disciplinary Board relies heavily, as did the Superior Court, on *Withrow v. Larkin,* 421 U.S. 35, 43 L. Ed. 2d 712, 95 S. Ct. 1456 (1975), where the Supreme Court

---

[5]The record is silent as to when the Board met and voted on the findings and conclusions.

[6]Because we believe the Board's procedures require reversal, we do not address the issue of the sufficiency of the evidence.

upheld a Wisconsin statute concerning discipline of doctors.
We agree with the Board and the Superior Court that *Withrow* controls the issue of due process. In *Withrow* the Supreme Court stated:

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

*Withrow,* 421 U.S. at 47. The court went on to hold:

> The initial charge or determination of probable cause and the ultimate adjudication have different bases and purposes. The fact that the same agency makes them in tandem and that they relate to the same issues does not result in a procedural due process violation.

*Id.* at 58.

Johnston attempts to distinguish *Withrow* on the ground that *Withrow* involved only a combination of the investigative and adjudicative functions, whereas this case involves a combination of the investigative, adjudicative, and prosecutorial functions. If the Board did in fact prosecute the case against Johnston, this distinction would be well taken. *See, e.g., Huber Pontiac, Inc. v. Allphin,* 431 F. Supp. 1168 (S.D. Ill. 1977), *vacated on other grounds sub nom. Huber Pontiac, Inc. v. Whitler,* 585 F.2d 817 (7th Cir. 1978). Our review of the record, however, indicates that despite some rather ambiguous comments by Board members,[7] the Board itself did not prosecute the case against Johnston. That function was performed by Keith, the assistant attorney general assigned to the Board. It does

---

[7] At the February 11, 1977 meeting of the Board, the following colloquy occurred:

not follow that merely because Keith was assigned to the Board, the Board prosecuted the case. Nor does the fact that members of the Board questioned Johnston extensively require us to hold that the Board prosecuted Johnston; such questioning is analogous to a judge questioning a witness during a bench trial. Furthermore, such questioning is especially appropriate in a case such as this where the Board members themselves are physicians authorized under controlled circumstances to take notice of specific facts within their specialized knowledge and to utilize their special knowledge in the evaluation of the evidence presented to them. *See* RCW 34.04.100(4). Consequently, we hold that the Disciplinary Board's procedures did not violate due process.

Johnston also argues that the Board's procedures violated the Washington administrative procedures act. Specifically, Johnston cites three sections of the APA that he contends the Board disregarded: (1) RCW 34.04.115, dealing with prohibited ex parte consultations; (2) RCW 34.04-.100(2), concerning evidence considered by the Board; and (3) former RCW 34.04.090(6), dealing with findings of fact entered by the Board. As we interpret these sections, however, none have been violated.

RCW 34.04.115 provides that:

> Except upon notice and opportunity for all parties to be present or to the extent required for the disposition of ex parte matters as authorized by law, no hearing examiner or agency or member of an agency presiding in a contested case or preparing a decision, or proposal for decision shall consult with any person or party on any issue of fact or law in the proceeding, except that in ana-

---

"MR. KORUM: [Johnston's attorney] I don't wish to make a statement, I would like to go a little bit more into your openmindedness as far as hearing this, Doctor. Aren't you in a position of being like a prosecutor in this case, as well as a judge; that's what concerns both Mr. Cody and myself.

"DOCTOR DIEFENDORF: This matter has of course been talked about in Disciplinary Board circles and to a certain extent that's true."

We interpret this comment to mean merely that the Board, acting through the assistant attorney general, acts as prosecutor.

lyzing and appraising the record for decision any agency member or hearing examiner may (1) consult with members of the agency making the decision, (2) have the aid and advice of one or more personal assistants, (3) have the assistance of other employees of the agency who have not participated in the proceeding in any manner, who are not engaged for the agency in any investigative func-'tions in the same or any current factually related case and who are not engaged for the agency in any prosecutory functions.

Johnston contends RCW 34.04.115 was violated when members of the Board consulted at various times with Keith, investigators assigned to the Board, and Mack without Johnston or his attorney being present. These consultations occurred prior to the hearings involving Johnston and the decision revoking his license. As we interpret RCW 34.04.115, however, such prehearing consultations are not impermissible, as this section only becomes relevant when members of the Board are "presiding in a contested case or preparing a decision, or proposal for decision . . ." There is nothing in the record to suggest that once the hearing stage was reached, such ex parte consultations occurred.

We also believe that Johnston's contention that RCW 34.04.100(2) has been violated is without merit. RCW 34.04.100(2) requires that "[a]ll evidence . . . shall be offered and made a part of the record in the case, and no other factual information or evidence shall be considered in the determination of the case." Johnston argues that this section was violated because, prior to the filing of charges, members of the Board had read various investigative reports on Johnston and the letters of complaint from Mack and Sandstrom, none of which were made a part of the record. Nothing, however, in the record indicates that members of the Board "considered" these documents in reaching their decision.[8] Merely reading the documents

---

[8]In support of his argument Johnston quotes the following remark by Dr. Iverson: "I think counsel needs to recognize that we are not a sequestered jury; that as working physicians who are in contact with the public that we do, we do not go into a closed room each night of a hearing procedure that has taken place

when charges against Johnston were first contemplated does not rise to the level of "consideration" contemplated by RCW 34.04.100(2). To so hold would be contrary to the "presumption of honesty and integrity in those serving as adjudicators" noted in *Withrow*. *See Withrow*, 421 U.S. at 47.

The third section cited by Johnston is former RCW 34.04.090(6), which requires that "[f]indings of fact shall be based exclusively on the evidence and on matters officially noticed." In contending that this provision has been violated, Johnston basically contends that no evidence was introduced regarding "acceptable surgical standards," which the Board found Johnston had violated. This argument is not persuasive, as we believe the Board members, being doctors themselves, were quite competent for these proceedings to draw their own conclusions as to "acceptable surgical standards." *See Jaffee v. State Dep't of Health*, 135 Conn. 339, 64 A.2d 330 (1949). *See also FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 814, 56 L. Ed. 2d 697, 98 S. Ct. 2096 (1978). To hold otherwise would frustrate the very purpose of the statutory mandate, as then enacted, that all members of the Disciplinary Board shall hold "a valid license to practice medicine and surgery". RCW 18.72.040.

Finally, Johnston contends the procedures followed by the Board in revoking his license violated the appearance of fairness doctrine. In support of this argument Johnston essentially contends that the cumulative effect of the Board's conduct was to "inescapably cast an aura of improper influence, partiality and prejudgment over the proceedings thereby creating and erecting the appearance of unfairness . . ." *Chrobuck v. Snohomish County*, 78 Wn.2d 858, 870, 480 P.2d 489 (1971). We agree.

---

over a six month period and that materials do come to our attention which are not necessarily directed into evidence here, . . ."

Read in its proper context, however, this remark merely states the obvious— that Board members do not live in vacuums.

■ We note initially that the appearance of fairness doctrine applies to proceedings such as those conducted by the Disciplinary Board. *Chicago, M., St. P. & Pac. R.R. v. State Human Rights Comm'n*, 87 Wn.2d 802, 557 P.2d 307 (1976); *Stockwell v. State Chiropractic Disciplinary Bd.*, 28 Wn. App. 295, 622 P.2d 910 (1981). The purpose of this doctrine was clearly enunciated many years ago:

> The principle of impartiality, disinterestedness, and fairness on the part of the judge is as old as the history of courts; in fact, the administration of justice through the mediation of courts is based upon this principle. It is a fundamental idea, running through and pervading the whole system of judicature, and it is the popular acknowledgement of the inviolability of this principle which gives credit, or even toleration, to decrees of judicial tribunals. Actions of courts which disregard this safeguard to litigants would more appropriately be termed the administration of injustice, and their proceedings would be as shocking to our private sense of justice as they would be injurious to the public interest. The learned and observant Lord Bacon well said that the virtue of a judge is seen in making inequality equal, that he may plant his judgment as upon even ground. Caesar demanded that his wife should not only be virtuous, but beyond suspicion; and the state should not be any less exacting with its judicial officers, in whose keeping are placed not only the financial interests, but the honor, the liberty and the lives of its citizens, and it should see to it that the scales in which the rights of the citizen are weighed should be nicely balanced, for, as was well said by Judge BRONSON in *People v. Suffolk Common Pleas*, 18 Wend. 550:
>
> "Next in importance to the duty of rendering a righteous judgment, is that of doing it in such a manner as will beget no suspicion of the fairness and integrity of the judge."

*State ex rel. Barnard v. Board of Educ.*, 19 Wash. 8, 17, 52 P. 317 (1898). Thus, even a mere suspicion of irregularity or an appearance of bias or prejudice must be avoided. *Chicago, M., St. P. & Pac. R.R. v. State Human Rights Comm'n, supra* at 809.

■■ Applying the doctrine to this case, we are com-

pelled to hold that a disinterested person would be reasonably justified in thinking that partiality may have existed. *See Swift v. Island County,* 87 Wn.2d 348, 552 P.2d 175 (1976). There is no real dispute that Board members were actively involved in investigating the charges against Johnston. At the first hearing regarding the suspension of Johnston's license, the chairman of the Board stated "that the Board is quite thoroughly conversant with all the factors that have led up to this hearing." Board members, as noted above, had reviewed investigative reports prepared by the staff of the Board and the letters of complaint from Drs. Mack and Sandstrom. The formal charges against Johnston were issued over the name of the secretary of the Board, who also sat as a Board member in the adjudication of the charges. One member went so far as to discuss the case privately with a key witness, Mack, prior to these proceedings. These same Board members ultimately determined whether Johnston's license should be revoked. Although this combination of the investigative and adjudicative functions, as discussed above, does not amount to violation of due process, nevertheless, it allows the Board to act as accuser and judge in the same proceedings. As the Supreme Court stated in *State ex rel. Beam v. Fulwiler,* 76 Wn.2d 313, 315–16, 456 P.2d 322 (1969):

> Despite the integrity of the respective members of the commission, and their undoubted desire to be objective in their appellate disposition of the matter, it is highly unlikely, under the unusual circumstances prevailing, that the respondent or anyone in a like situation could approach or leave a hearing presided over by a tribunal so composed with any feeling that fairness and impartiality inhered in the procedure.

*See also Loveland v. Leslie,* 21 Wn. App. 84, 583 P.2d 664 (1978).

In addition to this combination of functions, an aspect of the Board's proceedings which, we do not deem dispositive, yet worthy of comment, raises the specter of unfairness. Throughout these proceedings the one assistant attorney

general assigned to the Board acted in a dual capacity as legal adviser to the Board and prosecutor. Although this dual capacity is specifically authorized by RCW 18.72.040, we believe performance of the two roles by the same individual is inherently inconsistent and thus creates the possibility of disproportionate influence with the Board.[9]

■ The Board's response to this issue is that the appearance of fairness doctrine is not violated if due process is not violated. We do not believe, however, that the broad language contained in the cases supports this argument. *See* Vache, *Appearance of Fairness: Doctrine or Delusion,* 13 Willamette L.J. 479, 487 (1977). Further, traditional due process analysis focuses on the possibility of actual bias or prejudice. *See, e.g., Withrow v. Larkin,* 421 U.S. 35, 43 L. Ed. 2d 712, 95 S. Ct. 1456 (1975); *Tumey v. Ohio,* 273 U.S. 510, 71 L. Ed. 749, 47 S. Ct. 437, 50 A.L.R. 1243 (1927); *FTC v. Cement Inst.,* 333 U.S. 683, 92 L. Ed. 1010, 68 S. Ct. 793 (1948). The appearance of fairness doctrine, however, clearly focuses on the possibility of the *appearance* of bias or prejudice. *See Narrowsview Preservation Ass'n v. Tacoma,* 84 Wn.2d 416, 526 P.2d 897 (1974); *Chicago, M., St. P. & Pac. R.R. v. State Human Rights Comm'n, supra.*

In conclusion, we feel compelled by our holding to discuss future proceedings. By our decision we do not hold that all Disciplinary Board proceedings, as currently conducted, are invalid. We note that as presently enacted the statute governing the Disciplinary Board provides for the appointment of pro tem members for the purpose of participating in disciplinary proceedings. RCW 18.72.135. As we read the current statute, the problems inherent when the Board members who investigate charges are the same

---

[9]We expressly emphasize that we in no way imply that Mr. Keith, the assistant attorney general assigned to the Board, acted improperly in this case. Indeed, the record indicates that Keith performed his duties in an exemplary fashion. Our analysis, however, must focus on the appearance of impropriety. Actual impropriety is not the standard. *See Narrowsview Preservation Ass'n v. Tacoma,* 84 Wn.2d 416, 526 P.2d 897 (1974).

members who ultimately act as decision makers can be avoided by the convening of separate panels to investigate and adjudicate specific charges. Such a procedure is an alternative method of eliminating the inconsistent nature of the assistant attorney general's dual capacity, as he or she would be acting as adviser to one panel and prosecutor to a separate panel.

We also wish to emphasize that by our decision we are not questioning the ability of doctors to act in a quasi-judicial capacity. Our review of the record, which consists almost entirely of highly technical medical testimony, confirms the wisdom of the legislature's decision to place responsibility for the discipline of doctors on members of the medical profession. Clearly, fellow physicians have the requisite expertise and experience to understand best the appropriate standards to which all doctors must adhere. Nor do we mean to impugn the integrity of the Board members involved in this case. As we noted above, see footnote 9, *supra,* our focus must be directed toward the appearance of impropriety; our remarks should not be construed as implying that actual impropriety occurred.

Reversed and remanded for a new hearing.[10]

PEARSON and CORBETT, JJ., concur.

Reconsideration denied August 4, 1981.

Review granted by Supreme Court November 6, 1981.

---

[10]Pursuant to RCW 34.04.170, Johnston's license was initially summarily suspended. Hearings were eventually conducted at which the Board considered whether the suspension should be stayed. The suspension was not stayed. Johnston instituted legal proceedings in the Superior Court for King County to vacate the suspension. These proceedings were apparently abandoned. Our decision in no way affects the validity of the initial suspension, and *we explicitly decline to vacate the suspension pending a new hearing.*