[No. 48104–1. En Banc. May 5, 1983.]

WASHINGTON MEDICAL DISCIPLINARY BOARD, *Petitioner,* v. JAMES C. JOHNSTON, *Respondent.*

*Kenneth O. Eikenberry, Attorney General,* and *Richard A. Finnigan, Assistant,* for petitioner.

*Hamley, Hamley & Armstrong* and *G. Cliff Armstrong, Jr.,* for respondent.

WILLIAMS, C.J.—This is a medical disciplinary proceeding wherein petitioner, Washington State Medical Disciplinary Board (board), sought to revoke the medical license of respondent, Dr. James C. Johnston. After an administrative hearing, the board ordered revocation of respondent's medical license. On review, the Thurston County Superior Court upheld the board's ruling. Division Two of the Court of Appeals reversed and remanded for a new administrative hearing on the basis of the appearance of fairness doctrine. *State Med. Disciplinary Bd. v. Johnston,* 29 Wn. App. 613, 630 P.2d 1354 (1981). For the reasons set forth below, we reverse the Court of Appeals and reinstate the board's revocation of respondent's license to practice medicine.

From 1973 to 1976, respondent conducted a "preventive medicine" practice in Bellevue. Part of his practice consisted of treating various ailments with "natural remedies". The board initiated these medical disciplinary proceedings against respondent for his alleged "gross incompetency" in the treatment of two patients, Robert Hendrickson and Marcella Moore, and for aiding and abetting Remigio Peralta in the unlicensed practice of medicine. The following is a summary of the facts underlying respondent's

involvement with Hendrickson, Moore, and Peralta:

Robert Hendrickson: Respondent first saw Mr. Hendrickson in May of 1976 for a urinary problem. In early July of 1976 Hendrickson, complaining of a large blister on his abdomen, again contacted respondent. On July 10, 1976, respondent went to Hendrickson's home and found him to be critically ill. Respondent later testified that at this point, he repeatedly suggested hospitalization and diagnostic tests to Mr. Hendrickson, but that Hendrickson refused because of his distrust of hospitals and the medical profession. It was at this point, according to the respondent, that he pursued "natural remedies" as a last resort. The program of treatment prescribed by the respondent included herbal tea enemas, a liquid diet, and periods of fasting.

By August 2, 1976, Mr. Hendrickson had lost a great deal of weight and remained critically ill. Respondent testified that he again recommended hospitalization, but Hendrickson refused. An abdominal wall abscess developed, which respondent treated by suturing. Respondent testified this abscess was in fact a sterile ulcer. After three more office visits, respondent finally convinced Mr. Hendrickson to seek hospital care. He was admitted to Swedish Hospital in Seattle on August 10, 1976, and was placed in the care of Dr. Robert M. Mack. Dr. Mack's initial diagnosis was that Mr. Hendrickson's abdominal problems were the result of a cancerous growth. The diagnosis was confirmed by laboratory analysis of tissue specimens removed during exploratory surgery.

While in the hospital, Hendrickson developed pneumonia and acute renal failure and his condition continued to deteriorate until, on August 25, 1976, he died. Dr. Mack's final diagnosis noted three contributing causes of death: (1) cancer of the colon; (2) respiratory failure caused by pneumonia; and (3) renal failure resulting from shock.

Marcella Moore: Mrs. Moore, like Mr. Hendrickson, had a strong aversion to traditional medicine, and had a history of inclination toward self–medication. She had been a patient of the respondent since 1974. Respondent visited

Mrs. Moore on November 3, 1976, at the home of Dave and Carolyn McCormack, with whom Moore was then living. He found her to be seriously ill and preliminarily diagnosed the problem as gallstones lodged in her bile duct. Respondent recommended hospitalization, but Moore refused, preferring a program of "natural remedies".

Respondent spent the night caring for Mrs. Moore, his treatments consisting mainly of oral medications and administrations of coffee enemas diluted to the strength of 3 tablespoons of coffee per quart of water. According to respondent, at about 3:30 a.m. on November 4, Moore passed several gallstones in her bowel movements.

The following morning, respondent left Mrs. Moore in the care of Dave McCormack. According to respondent, Mr. McCormack was instructed to give her no more than two coffee enemas that morning and to immediately call him if there were any complications. Mr. McCormack testified that respondent instructed him to have Mrs. Moore eat normally and sleep as much as possible.

Later that afternoon, Moore began to feel much better and insisted on continuing the coffee enemas. They were administered approximately 10 times in the next 10 hours at stronger concentrations than respondent had prescribed. At 7:30 p.m. on November 4, 1976, Mrs. Moore had a seizure. Mr. McCormack phoned respondent, who instructed that the enemas should be discontinued and that he should be instructed of any changes in her condition. Nevertheless, Moore insisted on continuing the coffee enemas and suffered several more seizures, the last coming at approximately 5:45 a.m. on November 5. At this point, McCormack again phoned respondent, who ordered the dispatch of an ambulance.

Mrs. Moore was admitted to Evergreen Memorial Hospital in Everett, where Dr. Paul Sandstrom became her attending physician. She was comatose upon admission and suffered from an extreme electrolyte imbalance. Mrs. Moore died 12 days later. The autopsy report stated the cause of death as "the administration of large volumes of

fluid by enema." Exhibit 6.

Remigio Peralta: In 1975, respondent employed Remigio Peralta, who worked in Dr. Johnston's laboratory, served as a massage therapist, and assisted in the delivery of babies. Peralta had completed 3½ years of medical school at the University of Washington and held a degree in naturopathy from Bernadean University in Las Vegas, Nevada, but was not licensed to practice medicine in Washington. He also had pending an application for a Washington State midwifery license.

In October of 1975, Mr. and Mrs. Kenneth Solheim, who were expecting a child and wanted a home delivery, were referred by a licensed midwife to Dr. Johnston's clinic. They met with Peralta, whom they assumed to be a licensed physician. Peralta examined Mrs. Solheim and told the couple he would deliver their child. Approximately 1 week later, Peralta delivered the child without undue complications, performing such surgical procedures as cutting the child's umbilical cord. Despite never having met the Solheims, respondent signed the child's birth certificate as the attending physician.

The board was created by the Medical Disciplinary Board Act, RCW 18.72. The declaration of purpose of the act is set forth in RCW 18.72.010, as follows:

> This chapter is passed:
> (1) In the exercise of the police power of the state to protect public health, to promote the welfare of the state, and to provide an adequate public agency to act as a disciplinary body for the members of the medical profession licensed to practice medicine and surgery in this state;
> (2) Because the health and well–being of the people of this state are of paramount importance;
> (3) Because the conduct of members of the medical profession licensed to practice medicine and surgery in this state plays a vital role in preserving the health and well–being of the people of the state; and
> (4) Because the agency which now exists to handle disciplinary proceedings for members of the medical profession licensed to practice medicine and surgery in this state is ineffective and very infrequently employed, and

consequently there is no effective means of handling such disciplinary proceedings when they are necessary for the protection of the public health.

At the time of the hearing now in issue, the board consisted of seven physicians. Each board member was elected by other licensed physicians in each of the then-existing congressional districts. RCW 18.72.040. The board is empowered to investigate complaints of unprofessional conduct; to conduct hearings on such complaints; and to reprimand, suspend, or revoke the licenses of physicians guilty of such conduct. RCW 18.72.150.

In September of 1976, the board received a letter from Dr. Robert Mack, complaining of respondent's treatment of Mr. Hendrickson. Dr. Mack was Hendrickson's attending physician at the time of his death. Action was commenced on the complaint on or about September 21, 1976. The board had a preliminary investigation conducted by five investigators from the Division of Professional Licensing. The board then instructed Mr. John Keith, the assistant attorney general assigned to it as legal counsel, to draw up a statement of charges against the respondent. At some point prior to the hearings, the chairman of the board, Dr. Richard Diefendorf, initiated a telephone conversation with Dr. Mack in which the two men briefly discussed the complaint.

On December 3, 1976, the board received a complaint from Dr. Sandstrom, Marcella Moore's attending physician at the time of her death, regarding the respondent's treatment of Moore. Dr. Diefendorf, who was ill at the time, contacted the board's cochairman, Dr. Iverson, who on December 7, 1976, issued an order of summary suspension of respondent's medical license. On December 11, 1976, the board ratified the action and set a hearing date of January 15, 1977, to hear the respondent's case.

At a hearing on February 11, 1977, counsel for the respondent questioned the three members of the board then present, and eventually challenged their abilities to

act impartially in the matter because of their alleged prosecutorial involvement in the case, the chairman's relationship with Dr. Mack, and the members' possible prejudgment of the case. After consultation between the board's counsel and respondent's counsel, a stipulation was prepared whereby a hearing examiner would preside over the hearing and prepare findings of fact. The full board rejected this proposal and instead determined to hear the matter itself. On April 15, 1977, a hearing was held before the full board. Despite respondent's request for a continuance because his new counsel was unfamiliar with the entire case, the board heard prosecution witnesses against the respondent, and respondent's counsel cross-examined those witnesses. The case was continued to June 17, 1977, for the presentation of respondent's defense. At that time, Dr. Johnston testified on his own behalf. The board entered findings of fact and conclusions of law and on July 6, 1977, ordered that Dr. Johnston's license to practice medicine be revoked.

Respondent petitioned for review in superior court, and in a memorandum opinion the court affirmed the board. Appeal was then taken to the Court of Appeals, Division Two. The Court of Appeals found that there was no violation of the due process clause or of the administrative procedure act, RCW 34.04. The court did hold, however, that the involvement of the same board members as investigators and adjudicators violated the appearance of fairness doctrine. The case was thus reversed and remanded for a new hearing.

Respondent's appeal basically questions the procedures followed by the Disciplinary Board on the basis of violations of the (1) due process clause; (2) Washington administrative procedure act, RCW 34.04; and (3) appearance of fairness doctrine. Additionally, respondent challenges the sufficiency of the evidence relied upon by the board to revoke his license.

# I
## DUE PROCESS

Procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the due process clauses of the fifth and fourteenth amendments to the United States Constitution. *Mathews v. Eldridge,* 424 U.S. 319, 332, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976); *Wolff v. McDonnell,* 418 U.S. 539, 557–58, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974). "[T]he right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." *Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 168, 95 L. Ed. 817, 71 S. Ct. 624 (1951) (Frankfurter, J., concurring). A professional license revocation proceeding has been determined to be "quasi–criminal" in nature and, accordingly, entitled to the protections of due process. *In re Ruffalo,* 390 U.S. 544, 551, 20 L. Ed. 2d 117, 88 S. Ct. 1222 (1968); *Schware v. Board of Bar Examiners,* 353 U.S. 232, 238–39, 1 L. Ed. 2d 796, 77 S. Ct. 752 (1957); *In re Kindschi,* 52 Wn.2d 8, 11–12, 319 P.2d 824 (1958). Respondent raises two distinct issues of potential due process violations, each of which will be dealt with separately.

First, he contends that there was an element of prejudgment bias which deprived him of due process. In *Ritter v. Board of Comm'rs,* 96 Wn.2d 503, 512, 637 P.2d 940 (1981), this court recognized three types of bias which call for disqualification in quasi–judicial proceedings:

> "These are [1] prejudgment concerning issues of fact about parties in a particular case; [2] partiality evidencing a personal bias or personal prejudice signifying an attitude for or against a party as distinguished from issues of law or policy; and, [3] . . . an interest whereby one stands to gain or lose by a decision either way." (Footnote omitted.) *Buell v. Bremerton,* 80 Wn.2d 518, 524, 495 P.2d 1358 (1972); *See* 3 K. Davis, *Administrative Law* § 19.1, at 371 (2d ed. 1980).

Respondent recites the following language which, he con-

tends, demonstrates the first two types of bias as recognized in *Ritter*:

> DOCTOR DIEFENDORF: . . . It was my judgment, I'm speaking for myself, and the others can speak for themselves, that the handling of this case was so unheard of in my opinion and the approach to the handling of the case was so poor, that I thought that if there are other people that might be involved in a similar case, that this was a very dangerous thing and that's what I think now, speaking about myself personally, and I think the rest of the group feels the same way.
>
> Now, to get into the specifics of this thing, if you want to do it, we would naturally want to have all the appropriate witnesses here to prove what we think is correct. It's true that we don't use a summary suspension very often, but when we do, we feel that there is a real grave danger to the public and that's why we did it in this case.

Report of Proceedings, January 15, 1977, at 6.

■ Not only is a biased decision maker constitutionally unacceptable, but "our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison,* 349 U.S. 133, 136, 99 L. Ed. 942, 75 S. Ct. 623 (1955). Where there is merely a general predilection toward a given result which does not prevent the agency members from deciding the particular case fairly, however, there is no deprivation of due process. *See FTC v. Cement Inst.,* 333 U.S. 683, 92 L. Ed. 1010, 68 S. Ct. 793 (1948); *Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 333, 646 P.2d 113 (1982). *See generally* 3 K. Davis, *Administrative Law* § 19.1, at 371 (2d ed. 1980). It would seem that, given the board's duty to take emergency action to summarily suspend a physician's license if necessary to protect the public, its general predilection toward respondent's case is understandable and defensible. The above language, when read in an isolated context, tends to demonstrate a possible prejudgment bias against respondent and his unorthodox medical practices. When read in light of the board's duties to the public, however, Dr. Diefendorf's comments can be explained as an elaboration on why respondent's license

had to be suspended summarily for the protection of the public. *See* RCW 18.72.150(6). We find that no prejudgment bias was demonstrated to exist against respondent in this case.

The second due process contention of the respondent concerns the concentration of investigatory, prosecutory, and adjudicatory functions in one body. Respondent contends the combination of these potentially contradictory functions is, in itself, a violation of due process. The dangers inherent in combining such functions in a single entity have been noted by the United States Supreme Court:

> "A genuinely impartial hearing, conducted with critical detachment, is psychologically improbable if not impossible, when the presiding officer has at once the responsibility of appraising the strength of the case and of seeking to make it as strong as possible.

*Wong Yang Sung v. McGrath,* 339 U.S. 33, 44, 94 L. Ed. 616, 70 S. Ct. 445 (1950). *Accord, Huber Pontiac, Inc. v. Allphin,* 431 F. Supp. 1168, 1172 (S.D. Ill. 1977), *vacated on other grounds sub nom. Huber Pontiac, Inc. v. Whitler,* 585 F.2d 817 (7th Cir. 1978). The same concerns were expressed by Justice Brennan, then a New Jersey state judge, when he said the concern with concentration

> springs from the fear that the agency official adjudicating upon private rights cannot wholly free himself from the influences toward partiality inherent in his identification with the investigative and prosecuting aspects of the case; in other words, that the atmosphere in which he must make his judgments is not conducive to the critical detachment toward the case expected of the judge. In a sense the combination of functions violates the ancient tenet of Anglo–American justice that "No man shall be a judge in his own cause." . . . "*The litigant often feels that, in this combination of functions within a single tribunal or agency, he has lost all opportunity to argue his case to an unbiased official and that he has been deprived of safeguards he has been taught to revere.*"

(Citations omitted. Italics ours.) *In re Larsen,* 17 N.J. Super. 564, 574, 86 A.2d 430 (1952) (Brennan, J., concurring).

■ In the present case, the board, Superior Court, and Court of Appeals all relied upon the case of *Withrow v. Larkin,* 421 U.S. 35, 43 L. Ed. 2d 712, 95 S. Ct. 1456 (1975) as dispositive of the combination of functions issue. In that case, the Supreme Court noted the potential problems with a combination of functions, but went on to state:

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

*Withrow,* at 47. The concentration of functions in a single agency may be unfortunate and subject to much criticism, but where it has been designed by the Legislature and generally comports with notions of fairness and due process, it is almost uniformly upheld. *See Withrow v. Larkin, supra; Kennecott Copper Corp. v. FTC,* 467 F.2d 67, 79 (10th Cir. 1972), *cert. denied,* 416 U.S. 909, 40 L. Ed. 2d 114, 94 S. Ct. 1617 (1974). *See generally* B. Schwartz, *Administrative Law* § 111 (1976). We find *Withrow* to be the controlling authority with regard to the combination of functions issue on federal due process grounds. Therefore, we find no violation of the federal due process clauses.

Respondent contends, however, that Washington is free to provide greater due process protections to its citizens under the Washington Constitution's due process clause, Const. art. 1, § 3.[1] We have recently interpreted some provisions of our state constitution more expansively than parallel federal constitutional provisions. *See, e.g., State v.*

---

[1]Const. art. 1, § 3 provides:

"No person shall be deprived of life, liberty, or property, without due process of law."

*White,* 97 Wn.2d 92, 640 P.2d 1061 (1982) (Const. art. 1, § 7 broader than Fourth Amendment); *Alderwood Assocs. v. Washington Envtl. Coun.,* 96 Wn.2d 230, 635 P.2d 108 (1981) (Const. art. 1, § 5 broader than First Amendment); *State v. Fain,* 94 Wn.2d 387, 617 P.2d 720 (1980) (Const. art. 1, § 14 broader than Eighth Amendment); *Darrin v. Gould,* 85 Wn.2d 859, 540 P.2d 882 (1975) (Const. art. 1, § 12 broader than Fourteenth Amendment equal protection clause). Respondent cites *State ex rel. Beam v. Fulwiler,* 76 Wn.2d 313, 456 P.2d 322 (1969) as establishing such an increased level of protection under the Washington due process clause. While we have interpreted our state constitution to provide greater protections than the federal constitution under some circumstances, and will continue to do so if the need arises, we decline respondent's invitation to do so in this case. Since the appearance of fairness doctrine already provides procedural protections beyond the minimum requirements of the federal due process clauses, *see* Vache, *Appearance of Fairness: Doctrine or Delusion?,* 13 Willamette L.J. 479 (1977), we find it unnecessary to expansively read the parallel state constitutional provision.

## II
### APPEARANCE OF FAIRNESS

Under the appearance of fairness doctrine, proceedings before a quasi–judicial tribunal are valid only if a reasonably prudent and disinterested observer would conclude that all parties obtained a fair, impartial, and neutral hearing. *Swift v. Island Cy.,* 87 Wn.2d 348, 361, 552 P.2d 175 (1976). Although this doctrine originated in the land use area, *see Smith v. Skagit Cy.,* 75 Wn.2d 715, 453 P.2d 832 (1969), it has been extended to other types of quasi–judicial administrative proceedings, *see Chicago, M., St. P. & Pac. R.R. v. State Human Rights Comm'n,* 87 Wn.2d 802, 557 P.2d 307 (1976).

The Court of Appeals in the present case concluded that an appearance of unfairness is created by the same tribunal combining investigative and adjudicative func-

tions. *State Med. Disciplinary Bd. v. Johnston,* 29 Wn. App. 613, 626, 630 P.2d 1354 (1981). The court cited to the following language from *State ex rel. Beam v. Fulwiler, supra* at 315–16, in support of its analysis:

> *Inescapably the commission members became the investigators, the accusers, the prosecutors, mayhaps the witnesses, and if allowed to sit as an appellate tribunal, the judges upon the merits of the charges.* Despite the integrity of the respective members of the commission, and their undoubted desire to be objective in their appellate disposition of the matter, *it is highly unlikely, under the unusual circumstances prevailing, that the respondent or anyone in a like situation could approach or leave a hearing presided over by a tribunal so composed with any feeling that fairness and impartiality inhered in the procedure.*

(Italics ours.) *Beam,* however, can be read as involving not merely a combination of functions, but also prejudgment bias, since several members of the tribunal had taken a public stance on the case beforehand. It appears the Court of Appeals concern that combining investigative and adjudicative functions in one agency is well founded, since even the United States Supreme Court has characterized the issue as "substantial". *Withrow v. Larkin, supra* at 51. Nevertheless, we detect no inherent unfairness in the mere combination of investigative and adjudicative functions, without more, that would prompt invocation of the appearance of fairness doctrine. The bare fact that the same administrative adjudicators also are clothed with investigative powers does not mean the case will be decided on an improper basis or that there will arise a prejudgment on the ultimate issues. We must presume the board members acted properly and legally performed their duties until the contrary is shown. *Hoquiam v. PERC,* 97 Wn.2d 481, 646 P.2d 129 (1982); *Rosso v. State Personnel Bd.,* 68 Wn.2d 16, 20, 411 P.2d 138 (1966). We are convinced the mere combination of adjudicative and investigative powers in one agency, without more, would not be viewed by a reasonably prudent and disinterested observer as denying any party a

fair, impartial, and neutral hearing.

The opinion of the Court of Appeals also questioned the practice of assigning a single assistant attorney general to serve as both the board's legal advisor and prosecutor, but considered this matter "not . . . dispositive, yet worthy of comment, [and] rais[ing] the specter of unfairness." *State Med. Disciplinary Bd. v. Johnston, supra* at 626. The court noted that although this dual capacity is authorized by RCW 18.72.040,[2] it believed the performance of both roles by the same individual was inherently inconsistent and created the potential for disproportionate influence with the board.

In *State ex rel. State Bd. of Med. Examiners v. Clausen,* 84 Wash. 279, 284–85, 146 P. 630 (1915), this court examined the meaning of RCW 43.10.067, which pertains to the employment of attorneys other than the Attorney General.[3] The court found the state board of medical examiners had no express or implied power to employ private counsel at state expense since the Attorney General was, by statute, made the exclusive legal representative of the board. While *Clausen* remains the law in this area, we do not read that case to mean RCW 43.10.067 restricts the number of assistant attorneys general that can be assigned to any one agency. When the performance of any legal duties required of the Attorney General presents actual conflicts of interest, a different assistant attorney general can, and should, be assigned to handle those inconsistent functions. The Georgia Court of Appeals in *Schaffer v. State Bd. of Veterinary Medicine,* 143 Ga. App. 68, 237 S.E.2d 510 (1977) recently

---

[2]RCW 18.72.040 provides, in part: "The attorney general shall be the advisor of the board and shall represent it in all legal proceedings."

[3]RCW 43.10.067 provides, in pertinent part:

"No officer, director, administrative agency, board, or commission of the state, other than the attorney general, shall employ, appoint or retain in employment any attorney for any administrative body, department, commission, agency, or tribunal or any other person to act as attorney in any legal or quasi legal capacity in the exercise of any of the powers or performance of any of the duties specified by law to be performed by the attorney general . . ."

held the position of a single attorney as both legal advisor and prosecutor was prejudicial when the position actually permitted him to prevail upon the board in its decisions. We find that no actual prejudice has been demonstrated in the present case, but when the dual roles of the Attorney General present such a conflict, two separate attorneys should handle those functions. *See also* CPR DR 7–110 (prohibiting ex parte communications with the decision maker while the case is pending). In sum, we do not believe under the facts of this case that a reasonably prudent and disinterested observer would be left with the feeling that a fair, impartial, and neutral hearing was denied to any party in this action.

### III
### WASHINGTON ADMINISTRATIVE PROCEDURE ACT

Respondent contends the board violated three provisions of the Washington administrative procedure act, RCW 34.04: (1) RCW 34.04.115, prohibiting ex parte consultations by agency members with parties or witnesses during the proceeding; (2) RCW 34.04.100(2), requiring all evidence used to be offered into evidence on the record; and (3) RCW 34.04.090(7), requiring findings to be based exclusively on the record and on matters officially noticed by the board.

As to the first asserted violation concerning the board's consultation with its investigators and a telephone conversation between Dr. Diefendorf and a witness, Dr. Mack, we find no violation of the statute. The board's actions were entirely in accordance with its investigatory powers, as provided in RCW 18.72.150(2). We must construe RCW 34.04.115 to prohibit ex parte consultations during the pendency of the proceedings—not prior to such hearings—or else the board would be without power to carry out its investigatory functions.

We likewise find no violation of RCW 34.04.100(2), since the board apparently did not consider the reports prepared by the investigators while making its decision. Without

consideration of those documents in the decisionmaking process, no need arises to place the investigative reports on the record.

██ The asserted violation of RCW 34.04.090(7) arises from the board's conclusion that the respondent violated "accepted surgical standards" without specifically placing evidence on the record of such standards. Since the board is composed strictly of licensed physicians, RCW 18.72.040, and since RCW 34.04.100(4) permits agencies to utilize the specialized knowledge of their members in evaluating evidence presented to them, we believe it is logical and proper for the State Medical Disciplinary Board to draw its own conclusions as to acceptable surgical standards. As to such specialized matters, we give deference to administrative expertise. *See English Bay Enters., Ltd. v. Island Cy.,* 89 Wn.2d 16, 21, 568 P.2d 783 (1977). Additionally, we note that some testimony on acceptable surgical standards in this area was elicited and placed on the record. We find respondent's contention that the board's conclusions were not based on the evidence to be devoid of merit.

## IV
### SUFFICIENCY OF EVIDENCE

Finally, respondent argues the evidence was insufficient to support the board's factual findings and conclusion that his license to practice medicine should be revoked. The Court of Appeals did not pass on the sufficiency of the evidence because it reversed on the appearance of fairness grounds. We have evaluated the large quantity of evidence before us, and have set out a great deal of that evidence in reciting the facts of this case. We find the evidence was sufficient to support the board's revocation of respondent's medical license.

██ Our judicial review of this case is limited by the "arbitrary or capricious" standard, as set out in RCW 34.04.130(6)(f). Arbitrary and capricious action has been defined as "willful and unreasoning action, without consideration and in disregard of facts or circumstances." *Lillions*

*v. Gibbs,* 47 Wn.2d 629, 633, 289 P.2d 203 (1955). Action taken after giving respondent ample opportunity to be heard, exercised honestly and upon due consideration, even though it may be believed an erroneous decision has been reached, is not arbitrary or capricious. *Washington State Employees Ass'n v. Cleary,* 86 Wn.2d 124, 542 P.2d 1249 (1975); *Bishop v. Houghton,* 69 Wn.2d 786, 420 P.2d 368 (1966).

In the present case, the State Medical Disciplinary Board made its findings after a thorough consideration of all the evidence available to it. We cannot substitute our judgment for that of the board, even if we were to see the evidence differently than the agency. *Department of Ecology v. Ballard Elks Lodge 827,* 84 Wn.2d 551, 527 P.2d 1121 (1974). Further, we must give due deference to the knowledge and expertise of the board. *English Bay Enters., Ltd. v. Island Cy., supra.* Accordingly, we find the conclusions of the board fully supported by the record and not arbitrary or capricious.

We reverse the Court of Appeals and reinstate the decision of the trial court which upheld the State Medical Disciplinary Board's revocation of Dr. James C. Johnston's license to practice medicine in the state of Washington.

It is so ordered.

STAFFORD and BRACHTENBACH, JJ., concur.

UTTER, J. (concurring)—I concur in the result reached by the majority, though I consider unnecessarily confusing its discussion of the appearance of fairness doctrine as separate from the requirements of due process. As I have stated elsewhere (*see Harris v. Hornbaker,* 98 Wn.2d 650, 658 P.2d 1219 (1983)), I think the appearance of fairness doctrine should consist of no more than importing procedural due process safeguards into quasi–judicial proceedings of legislative bodies. Here, the medical disciplinary board is unquestionably a body created for adjudicatory purposes. Its decisions must be measured against the requirements of

due process.

The majority structures its argument as if there were a difference between the appearance of fairness and due process. However, its analysis of the appearance of fairness doctrine merely reiterates the requirements of due process. The conclusion is proper but involves no more than the requirements of due process. I therefore concur.

The requirement that a reasonably prudent and disinterested observer should be able to conclude all parties obtained a fair, impartial and neutral hearing is a fundamental tenet of due process. The majority examines two possible violations of the appearance of fairness doctrine under this standard: (1) the combination of adjudicative and investigative functions, and (2) the assignment of an assistant attorney general as the board's legal advisor and as the prosecutor. The majority's analysis begins with the presumption that board members performed their adjudicative functions properly and legally "until the contrary is shown." Majority opinion, at 479. Such is the presumption accorded all judicial officers. As to the first potential violation, the majority finds "no inherent unfairness in the mere combination of investigative and adjudicative functions, *without more*", to prompt application of the appearance of fairness doctrine. (Italics mine.) Majority opinion, at 479. As to the second possible violation, the majority concedes the potential for a conflict of interest in the dual role of the assistant attorney general, but declines to apply the appearance of fairness doctrine since "no *actual* prejudice has been demonstrated in the present case . . ." (Italics mine.) Majority opinion, at 481. The majority's discussion is simply one of due process; its analysis regarding the appearance of fairness is almost verbatim that in *Withrow v. Larkin*, 421 U.S. 35, 43 L. Ed. 2d 712, 95 S. Ct. 1456 (1975), a case analyzing the requirements of due process.

This is not to say due process involves only a concern for whether actual wrongs have occurred. Due process also concerns protecting against even "the probability of unfairness." *In re Murchison*, 349 U.S. 133, 136, 99 L. Ed. 942, 75

S. Ct. 623 (1955). A new hearing is required in certain situations, such as where an adjudicator has a pecuniary interest in the outcome because the individual "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Withrow v. Larkin, supra* at 47. No such situation is presented here. Without more, "The processes utilized by the Board . . . do not in themselves contain an unacceptable risk of bias." *Withrow v. Larkin, supra* at 54.

To label what are really due process concerns as the appearance of fairness doctrine is unnecessarily confusing to lawyers who must attempt in some way to give meaning to an unfathomable phrase. If we wish to maintain the continuing vitality of concerns over procedural due process, its constitutional basis and scope must be acknowledged.

DOLLIVER and DIMMICK, JJ., concur with UTTER, J.

ROSELLINI, J. (dissenting)—The majority asserts that a reasonably prudent and disinterested observer would not be left with the feeling that a fair and neutral hearing is denied when, as here, the same tribunal combines investigative, prosecutorial and adjudicative functions. Majority opinion, at 481. I disagree. I believe the unanimous panel of the Court of Appeals correctly found an appearance of fairness violation. For the reasons set out in the lower court opinion, as well as those discussed below, I would therefore affirm.

The appearance of fairness doctrine was first enunciated in *Smith v. Skagit Cy.,* 75 Wn.2d 715, 741, 453 P.2d 832 (1969). The principles embodied in the doctrine, however, date back to our earliest reported cases. The passage cited by the Court of Appeals demonstrates this point and is worth repeating here. Justice Dunbar, writing in 1898, comments on the importance of the appearance of fairness.

The principle of impartiality, disinterestedness, and fairness on the part of the judge is as old as the history of

courts; in fact, the administration of justice through the mediation of courts is based upon this principle. It is a fundamental idea, running through and pervading the whole system of judicature, and it is the popular acknowledgment of the inviolability of this principle which gives credit, or even toleration, to decrees of judicial tribunals. Actions of courts which disregard this safeguard to litigants would more appropriately be termed the administration of injustice, and their proceedings would be as shocking to our private sense of justice as they would be injurious to the public interest.

*State ex rel. Barnard v. Board of Educ.,* 19 Wash. 8, 17–18, 52 P. 317 (1898).

In *State ex rel. Beam v. Fulwiler,* 76 Wn.2d 313, 456 P.2d 322 (1969), the court applied these principles. In that case, like here, the same board performed investigatory, prosecutorial and adjudicatory functions. The court observed:

It is clear from the recited background facts that four of the five members of the civil service commission which, by virtue of charter provisions constitute the appellate tribunal before which respondent's appeal would normally be heard, personally investigated respondent's administration of his office, formed their conclusions, promulgated the charges against him, transmitted these accusations over their signatures to the city manager, and recommended his discharge. *Inescapably the commission members became the investigators, the accusers, the prosecutors, mayhaps the witnesses, and if allowed to sit as an appellate tribunal, the judges upon the merits of the charges.* Despite the integrity of the respective members of the commission, and their undoubted desire to be objective in their appellate disposition of the matter, it is highly unlikely, under the unusual circumstances prevailing, that the respondent or anyone in a like situation could approach or leave a hearing presided over by a tribunal so composed with any feeling that fairness and impartiality inhered in the procedure.

(Italics mine.) *Beam,* at 315–16. Relying on *Beam,* the Court of Appeals concluded that it was "compelled" to hold that a disinterested person would be reasonably justified in

thinking that partiality may have existed. *State Med. Disciplinary Bd. v. Johnston,* 29 Wn. App. 613, 625–26, 630 P.2d 1354 (1981). I agree. The same procedures disapproved in *Beam* exist here. The majority attempts to distinguish *Beam* by urging that that case involved "not merely a combination of functions, but also prejudgment bias, since several members of the tribunal had taken a public stance on the case beforehand." Majority opinion, at 479. The majority's analysis, however, undercuts the appearance of fairness doctrine. If, as the majority asserts, *Beam* can be read as a prejudgment bias case, the court objections could and should be couched in terms of a due process analysis. If prejudgment bias is a necessary element of an appearance of fairness violation, no need exists for a doctrine separate and distinct from due process analysis. We, as a court, should then adopt the concurrence and abolish the doctrine. The majority has not done so, however, nor should it.

The appearance of fairness doctrine fills a void between actual bias and total impartiality. That intermediate position, I suggest, is critical to our maintaining public confidence in the fairness of adjudicatory functions. As noted in the passage quoted from *Barnard,* it is the popular acknowledgment of the inviolability of this principle which gives credit *or even tolerance* to our system of justice. Thus, "'[n]ext in importance to the duty of rendering a righteous judgment, is that of doing it in such a manner as will beget *no* suspicion of the fairness and integrity of the judge.'" (Italics mine.) *Barnard,* at 18.

The majority ignores the strong language of our cases and asserts that "the mere combination of adjudicative and investigative powers in one agency, without more, would not be viewed by a reasonably prudent and disinterested observer as denying . . . a fair, impartial, and neutral hearing." Majority opinion, at 479–80. I disagree. The majority neglects to point out that the Court of Appeals relied on the combination of three functions, not two. The board here serves not only investigative and adjudicatory func-

tions, it also performs the duties of prosecutor. For instance, RCW 18.72.170 provides that the board shall cause a statement of charges to be prepared. Thus the decision to prosecute rests with the very board which will decide the case on the merits. Even if the combination of investigative and adjudicatory functions does not violate the appearance of fairness doctrine, the addition of prosecutorial functions surely taints that proceeding. The majority ignores this fact, but a disinterested observer would not.

Factors such as the issuing of formal charges against Johnston over the name of the secretary of the board who then sat in judgment of Johnston also cannot be ignored. When this identity of functions is added to the use of the same attorney general as prosecutor and advisor, one cannot doubt the truth of the Court of Appeals statement that the "specter of unfairness" is raised. *Johnston*, at 626. Regardless of the integrity of the board members or attorney general, the confidential relationship of the board and its legal advisor cannot be reconciled with that same legal advisor also serving as prosecutor. This is what motivated three Court of Appeals judges to find an appearance of fairness violation. Likewise, these factors convince me that we must affirm that decision.

DORE, J., concurs with ROSELLINI, J.