[No. 15082-8-III. Division Three. March 18, 1997.]

EDWARD L. DEATHERAGE, Ph.D., *Appellant*, v.
EXAMINING BOARD OF PSYCHOLOGY, *Respondent*.

*Richard W. Kochansky*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Jerald R. Anderson, Assistant*, for respondent.

KURTZ, J. — Does the absolute immunity accorded a

witness protect an expert from licensing board disciplinary proceedings? Here, the State of Washington, Examining Board of Psychology, brought such proceedings after Edward Deatherage, Ph.D., allegedly failed to meet professional ethical standards in the work that formed the basis of his testimony in several child custody disputes. Dr. Deatherage raises the immunity issue in this appeal from a superior court judgment affirming the decision of the Board to revoke his license.[1] We hold absolute immunity for witnesses prevents the Board from disciplining Dr. Deatherage for work that supported his testimony. We reverse the superior court on that issue. We affirm the court on other issues that involve additional charges against Dr. Deatherage.

In October 1989, the Board filed a statement of charges against Dr. Deatherage seeking revocation of his license to practice as a psychologist in the state of Washington. For purposes of this appeal, the charges, as originally filed and as amended, centered on three allegations: (1) Dr. Deatherage rendered professional opinions in certain superior court custody disputes which were biased and misleading. (2) He failed to prevent the sexual abuse of two minor children in his custody. (3) He engaged in sexual and intimate conduct with an adolescent, "Witness F," who was one of his patients.

The Board conducted an administrative hearing on these charges in April, May, and June 1991. In August 1991, the Board issued its findings, conclusions, and order revoking Dr. Deatherage's license to practice psychology for 10 years. The Board found Dr. Deatherage stated opinions in regard to the fitness of three women as parents, in documents prepared for the court's use in custody disputes, which were based upon allegations made by the fathers that he did not verify by testing and/or interviewing the mothers. With regard to the alleged

---

[1]The superior court also reversed part of the Board's decision. (*See* superior court order, conclusions of law 2.4 and 2.6.) The Board has not cross-appealed.

sexual abuse of the two minor children in Dr. Deatherage's care, the Board found that a hearing before the Department of Social and Health Services (DSHS) determined he was "negligent in the care and supervision [of the two children] in that he failed to protect them from exposure to sexual activity inappropriate for a three and a five year old." As a result, DSHS referred Dr. Deatherage's name for placement on the Central Registry, a list of persons known to have neglected or abused children. The Board found these facts "raise serious questions about [Dr. Deatherage's] ability to recognize child sexual abuse in his practice as a psychologist when he was unable to recognize it in his own home." The Board also found Dr. Deatherage had acted as Witness F's psychologist; Witness F resided with Dr. Deatherage from December 1984 or January 1985 through May or June 1985; and the two shared a bed and engaged in intimate sexual contact.

The Board concluded the foregoing conduct constituted moral turpitude relating to the practice of psychology, and/or incompetence and negligence. The Board also concluded the conduct was grounds for discipline under former RCW 18.83.120,[2] which was in effect at the time of the events in question and applied to the proceeding against Dr. Deatherage pursuant to RCW 18.130.900.

First, did the Board err when it considered, as grounds for discipline, custody evaluations prepared by Dr. Deatherage for use in superior court family law matters? Dr. Deatherage contends the absolute immunity accorded to witnesses includes immunity from disciplinary action based upon the evaluations he prepared in his role as an expert witness in the custody cases. On August 20, 1990, the Board filed an amended statement of charges against Dr. Deatherage, charging that he had rendered opinions in reports used in three different court custody matters which were biased and based on insufficient, unverified evidence.

---

[2]Former RCW 18.83.120(4) defined unethical conduct as "[i]ncompetency or negligence in the practice of psychology which creates an unreasonable risk of physical or mental harm or serious financial loss to the consumer."

■ Dr. Deatherage moved to dismiss the above-mentioned charges as barred by the absolute immunity from suit accorded a witness in a judicial proceeding, relying upon *Bruce v. Byrne-Stevens & Assocs. Eng'rs, Inc.*, 113 Wn.2d 123, 776 P.2d 666 (1989). There, the Washington Supreme Court held the plaintiffs could not sue an expert witness, who had testified in their behalf in a damage action, for negligently computing their losses at only one-half of what they ultimately proved to be. The court stated: "the immunity of expert witnesses extends not only to their testimony, but also to acts and communications which occur in connection with the preparation of that testimony." *Bruce*, 113 Wn.2d at 136.

■ As *Bruce* recognized, the rule that witnesses in judicial proceedings are absolutely immune from lawsuits based upon their testimony is well established in American common law. *See Bruce*, 113 Wn.2d at 125, and cases cited therein. The rule's purpose is to encourage full and frank testimony and thereby preserve the integrity of the judicial process. *Bruce*, 113 Wn.2d at 126. If a witness fears subsequent liability for damages, he or she may be reluctant to testify, or may shade his or her testimony in favor of the potential plaintiff. *Bruce*, 113 Wn.2d at 126 (citing *Briscoe v. LaHue*, 460 U.S. 325, 332-33, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983)). "[T]he rule also rests on the safeguards against false or inaccurate testimony which inhere in the judicial process itself." *Bruce*, 113 Wn.2d at 126. Safeguards that foster witness reliability include the witness's oath, the right of the opposing party to cross-examine the witness and bring out any weakness in the testimony, and the ability of the State to charge perjury if a witness testifies falsely. *Bruce*, 113 Wn.2d at 126.

■ The rationale behind the witness immunity rule has equal applicability to disciplinary proceedings. An expert witness serves the court as the admissibility of expert testimony is based in part on the court's decision that it will assist the trier of fact. *Bruce*, 113 Wn.2d at 130. Fear of disciplinary proceedings may undermine the effective-

ness of an expert's assistance to the trier of fact. The detriment to encouraging full and frank testimony, occasioned by making expert witnesses subject to professional disciplinary proceedings, outweighs the interest of the state disciplinary board in policing individual practitioners for conduct related to their testimony. Further, the safeguards that foster witness reliability are similar, no matter whether the issue is immunity from disciplinary proceedings or immunity from a lawsuit. We, therefore, hold Dr. Deatherage is absolutely immune from professional discipline for any charges arising from his testimony as an expert witness in the child custody disputes listed above. The Board erred when it disciplined him on that basis.

Second, was the Board's consideration of Exhibit 1, DSHS's decision to place Dr. Deatherage on the State's Central Registry for child neglect, improper? Specifically, was the document relevant to the issue before the Board, and should DSHS have sealed the document pursuant to former WAC 388-15-136(5) because six years had passed without a subsequent complaint?

On March 21, 1991, the Board filed a second amended statement of charges against Dr. Deatherage. The statement charged further unethical conduct by Dr. Deatherage, and referenced the findings, conclusions and decision of DSHS that he had neglected two minor children who lived in his home in the early 1980s. Both of the children had lived with Dr. Deatherage since their births.

DSHS's documents relating to this charge became Exhibit 1 in the disciplinary proceedings. In summary, they indicate Dr. Deatherage had a habit of permitting various individuals, many of them patients, to reside in his home. One of these persons was the young man who fathered the two children who were the subject of DSHS's investigation. Dr. Deatherage eventually obtained legal custody of the children. In 1984, the children's preschool reported to DSHS that they exhibited certain behavior which indicated possible sexual abuse. During interviews, both chil-

dren stated Dr. Deatherage had touched them inappropriately. Dr. Deatherage relinquished custody, and a subsequent dependency action concluded the parents had neglected the children by failing to prevent the alleged sexual abuse.

Following the dependency determination, DSHS notified Dr. Deatherage it was referring his name to the Central Registry for reported incidents of child abuse. Dr. Deatherage challenged that decision and submitted to a psychological evaluation which concluded he probably had not abused the children. DSHS found it was unlikely he was the abuser. Nonetheless, it determined he neglected the children by failing to prioritize their safety and welfare above those of adults who also resided in his home during the time the children were there. For this reason, DSHS refused to change its decision and referred Dr. Deatherage's name to the Central Registry as of October 28, 1985, based upon neglect.

At the licensing board hearing, Dr. Deatherage moved to dismiss the charge that his conduct respecting the above minors evidenced moral turpitude in the practice of psychology. He argued unsuccessfully the conduct was irrelevant to the disciplinary proceedings. We agree with the Board's ruling that the information contained in Exhibit 1 was relevant. Under former RCW 18.83.120(1), "any act involving moral turpitude . . . relating to the practice of psychology" was grounds for discipline. As stated by the Board, the exhibit raised serious questions about Dr. Deatherage's ability to recognize child sexual abuse in his practice when he did not recognize it in his own home.

Dr. Deatherage also contended DSHS should have sealed the information in the Registry, pursuant to former WAC -388-15-136(5), because more than six years had passed without a subsequent report. The cited provision requires sealing of the information six years from the date of the *last filed* report. Dr. Deatherage counts the six years as commencing when DSHS notified him of its decision to re-

fer his name to the Registry—July 18, 1984. But DSHS did not actually make the reference until October 1985, following the hearing at which Dr. Deatherage disputed DSHS's decision. The second amended statement of charges, which included the allegations concerning the two minors, was filed in March 1991, before the six years elapsed.

Finally, Dr. Deatherage asserts the Board obtained Exhibit 1 "not through administrative procedure, but . . . outside the law." The availability of Central Registry records is addressed in former WAC 388-15-136(4), which provides: "[DSHS] may release child abuse or neglect information from the central registry as per section 12, chapter 524, Laws of 1987 . . . ."[3] Section 12 requires the release of Central Registry information to licensing boards. While the record does not indicate exactly how Exhibit 1 came into the State's possession, it does not appear Dr. Deatherage could have prevented the State's access to it.[4]

Accordingly, we hold the Board properly considered Exhibit 1.

Third, did the Board err when it considered Exhibit 1 in open session? In arguing "yes," Dr. Deatherage relies upon former RCW 26.44.070, which stated in part: "Those persons or agencies exempted by this section from the confidentiality of the records of the registry *shall not further disseminate or release such information so provided to them* . . . ." (Emphasis added.) The Board argues this prohibition does not apply to the exception to confidentiality created for licensing boards.

We need not decide whether licensing boards are exempt from the confidentiality requirement. Even if the Board

---

[3]That statute was never codified because former RCW 26.44.070, which it amended, was repealed in the same session.

[4]Dr. Deatherage also assigns error to the Board's holding he was collaterally estopped to present evidence disputing the conclusions found in Exhibit 1. However, he does not make any argument in support of this assignment of error.

violated the prohibition against disseminating the information, the error is insufficient to reverse the Board's revocation of Dr. Deatherage's license. As stated above, Exhibit 1 was available for the Board's consideration because as a licensing board, it fell within an exception to the confidentiality of such records. The effect on Dr. Deatherage was the same whether the Board considered it in open or in closed hearing.

There was no reversible error.

Fourth, is the Board's finding that Dr. Deatherage sexually molested Witness F, a teenage boy who was his patient and who resided with him for six months in 1985, supported by substantial evidence?

The Board found Dr. Deatherage counseled Witness F and his parents and siblings, starting in 1982. The family's problems resulted in Witness F moving out of first his mother's, and then his father's residence. At that time he was a high school sophomore, and he went to live with Dr. Deatherage, residing there from approximately January to May 1985. The Board found Dr. Deatherage's conduct with Witness F during this period included "typical grooming behavior," culminating in sexual contact with the witness in late spring or early summer of 1985. The Board specifically found that the witness and Dr. Deatherage shared a bed during part of the time the witness resided with him. The Board concluded the foregoing conduct constituted moral turpitude relating to the practice of psychology, as well as incompetence and negligence which created an unreasonable risk of mental or physical harm to the client, and was grounds for discipline.

██ The above findings and conclusions are supported by substantial evidence. At the hearing, Witness F testified Dr. Deatherage talked to him about sexual activity between persons of the same sex, using his patients as examples. He later asked the witness to sleep in his bed, and the witness eventually agreed because he believed he had no choice, given his need for a place to live. They slept in a "spoon" position, with the witness's back to Dr.

Deatherage's chest. Dr. Deatherage would rub the witness's body with his hands, gradually escalating from back rubs to rubbing the witness's genitals. The witness described one incident in which Dr. Deatherage was on top of him and ejaculated. He stated it was many years before he was able to talk about these events with a therapist. In December 1989, he contacted DSHS with this information.

In this appeal, Dr. Deatherage does not argue that the findings are unsupported by Witness F's testimony. Rather, his argument is that Witness F was not credible. He cites correspondence between the witness's parents, incidents of alleged sexual abuse of Witness F's younger brother by his stepfather and by his natural father, and affidavits of various family health counselors, all to the effect that Witness F had significant problems in his relationships. He also cites documents indicating Witness F's father threatened his mother, stating he would use the discipline proceedings against Dr. Deatherage in his appeal of the marital property division.

Dr. Deatherage presented the expert testimony of Ralph Underwager, Ph.D. Dr. Underwager tested and interviewed Dr. Deatherage and was of the opinion he did not engage in inappropriate sexual behavior with clients. He testified:

> There are two fundamental legs to that opinion, . . . the psychometric data which . . . does not produce any information that suggests in any way Dr. Deatherage shows any of the behavioral responses or the test patterns of persons known to be sexual offenders or persons known to have sexual contact with . . . their patients. There is . . . considerable research on this . . . .

> The second leg would be the clinical interviews that I have had and the information relayed to me by Dr. Deatherage, and my own impression and judgments of him and his personality, which I recognize is subjective . . . .

Dr. Underwager also testified about studies concerning false allegations of sexual abuse by adolescents. He stated

"a disturbed adolescent can have all kinds of potential motivations, reinforcements, stimuli that can produce a false accusation."

Dr. Deatherage's argument attacking Witness F's credibility begs the question. Nothing in the record required the Board to disbelieve Witness F's description of events occurring while he lived with Dr. Deatherage. Assessing the credibility of the witnesses at the hearing was for the Board, as the trier of fact. *Nghiem v. State*, 73 Wn. App. 405, 412, 869 P.2d 1086 (1994). Witness F's testimony constitutes substantial evidence the abuse occurred; i.e., it is " 'evidence in sufficient quantity to persuade a fair-minded person of the truth of the declared premises.' " *Olmstead v. Department of Health, Med. Section*, 61 Wn. App. 888, 893, 812 P.2d 527 (1991) (quoting *Green Thumb, Inc. v. Tiegs*, 45 Wn. App. 672, 676, 726 P.2d 1024 (1986)). The Board took into account Witness F's adolescent behavior problems, but nevertheless found him credible. It relied in part on the nature of his testimony, "which contained an accurate description of grooming behavior, which exceeded the level of sophistication and knowledge of Witness F based on his age, experience, and education, and because of Witness F's demeanor while testifying . . . ."

The Board's findings are supported by substantial evidence.

Fifth, was Dr. Deatherage deprived of his due process right to a fair hearing by the cumulative effect of the Board's incorrect rulings? In addition to the assignments of error discussed above, Dr. Deatherage contends the Board erred when it permitted cameras and recording devices into the hearing; failed to act impartially and considered evidence in a biased fashion; viewed evidence as unfavorable when in fact it supported his position; and improperly relied upon texts not admitted into evidence.

A. Propriety of Cameras in the Hearing.

██ ██ Dr. Deatherage asked the Board to keep cameras and recording equipment out of the hearing room. The

Board denied this request, citing RCW 34.05.449. That section of the Administrative Procedure Act provides that an administrative hearing "is open to public observation, except for the parts that the presiding officer states to be closed under a provision of law expressly authorizing closure or under a protective order entered by the presiding officer pursuant to applicable rules." RCW 34.05.449(5). The statute does not address directly the use of cameras and like equipment in the hearing.[5] In the absence of the Administrative Procedure Act addressing the issue, case law concerning the use of cameras in the courtroom is analogous. In *Chandler v. Florida*, 449 U.S. 560, 101 S. Ct. 802, 66 L. Ed. 2d 740 (1981), the Supreme Court held that due process does not require an absolute ban on cameras in court. The defendant must show actual prejudice to the fact-finding process and the right to fair trial. *Chandler*, 449 U.S. at 575. Here, Dr. Deatherage has not demonstrated such prejudice. His argument centers on assertions the cameras were disruptive and "ridiculous." These assertions are not sufficient reason to reverse.

B. Allegations of Partiality of Board Rulings; Biased Consideration of Evidence; and Reliance on Texts not Entered as Evidence.

Dr. Deatherage also complains about the following:

— The Board denied his motion to exclude Witness F's father from the hearing because he might call him as a witness, but granted the prosecuting assistant attorney general's motion to exclude the mother of the two minors allegedly neglected while in his care.

— The Board released information to the press and complaining witnesses, but he had to move to compel discovery of information he was entitled to receive. The State counters the complaining witnesses *did not* receive information about other allegations, other than what was

---

[5]The Board did close the hearing during testimony relative to the allegations of Witness F and the neglect of the two minor children who resided with Dr. Deatherage in the early 1980s.

contained in the statement of charges, which was a public record.

— The Board refused to allow him to question its Program Manager about how the press obtained information about what took place in closed session.

— The Board denied his motion for a continuance, even though his new counsel had only 17 days to prepare for the hearing.

— The Board twisted testimony of experts which supported Dr. Deatherage's position the alleged abuse never occurred, citing it in its findings to support its conclusion he conducted himself unprofessionally and unethically. For example, the Board allegedly disregarded everything in Dr. Deatherage's Millon Clinical Multiaxial Inventory (MCMI) test results, save for an item indicating slightly elevated "narcissistic tendencies." No evidence linked this item to a propensity for child abuse. The Board also cited the finding of Drs. Jacobsen and Naumann that Dr. Deatherage had a "somewhat Atypical Personality," when, in fact, it was atypical not because of any negative aspect, but because he exhibited higher than usual altruism and independence.[6] The State characterizes this argument as just another attempt to override the Board's judgment on credibility issues.

— The Board cited texts not entered into evidence. The State counters that RCW 34.05.452(5) permits the Board to take official notice of (a) "any judicially cognizable facts, [and] (b) technical or scientific facts within the

---

[6]The Board found that "during the time that Witness F lived with respondent, respondent engaged in intimate and sexual contact with Witness F, which is supported by a) the more credible testimony of Witness F . . .; b) *respondent's personality pattern as noted in the MCMI results, including narcissistic tendencies, and the report on respondent prepared by Dr. E. Clay Jorgensen*, which includes the following statement: 'Given the problems and difficulties that Dr. Deathridge (sic) has had in his relationships particularly the lack of consistency in the role definitions or boundaries and considering Dr. Deathridge's (sic) own sexual dysfunction, we would have to say that he is more likely than the average person to be capable of sexual misuse of children.'; c) *the conclusion of Dr. Jacobsen and Dr. Naumann in their report . . . that respondent had a 'somewhat Atypical Personality' (DSM III[)]*. . .; d) a review of the literature, including 'Sexual Predators in the Profession' . . . ." (Emphasis added.)

agency's specialized knowledge . . . ." The Board expressly referred to the texts at the hearing, and Dr. Deatherage did not object.

 Pursuant to RCW 34.05, an appellant's challenge to a discretionary ruling made by an administrative body sitting in an adjudicative capacity is grounds for reversal only if the appellant establishes it was arbitrary or capricious *and* prejudicial. RCW 34.05.570(3)(i), (1)(d). Dr. Deatherage has not shown how any of the referenced Board conduct operated to his substantial prejudice. With regard to the Board's interpretation of his psychological test results and the exams to which he submitted, the State is correct when it observes Dr. Deatherage's complaints concern the weight the Board elected to give to this evidence. As the trier of fact, the Board is entitled to weigh the evidence and draw conclusions therefrom. So long as the conclusions are supported by the evidence, it is immaterial whether there existed disputed facts or, in the case of expert testimony, disagreement in opinions. Additionally, the Board's conclusion that the alleged abuse occurred was not based solely on the test and evaluation results. The Board relied primarily upon Witness F's direct testimony, which was corroborated by his description of "grooming" conduct on the part of Dr. Deatherage. The average layman would not likely have knowledge of this type of behavior.

Dr. Deatherage has failed to establish prejudice resulting from the Board's rulings and consideration of the evidence.

Sixth, did the Board err when it considered these charges, all of which were based upon statutes that were repealed before the charges were brought? The Board concluded that Dr. Deatherage's conduct constituted grounds for discipline, based upon former RCW 18.83.120, that was in effect on the dates alleged in the statement of charges. That statute provided for license revocation as the appropriate discipline for the acts enumerated in its subsections. It was repealed in 1987. Dr. Deatherage as-

serts the Board erred when it relied upon this repealed law, but he does not explain why it was error.

The Uniform Disciplinary Act, RCW 18.130, superseded RCW 18.83.120 in 1987. RCW 18.130.900(3) provides that the Act "does not apply to or govern the construction of and disciplinary action for any conduct, acts, or conditions occurring prior to June 11, 1986. Such conduct, acts, or conditions must be construed and disciplinary action taken according to the provisions of law existing at the time of the occurrence . . . ." The charges here concerned pre-1986 conduct. Hence, the Board properly relied upon former RCW 18.83.120.

There was no error.

Seventh, was the appearance of fairness in this administrative proceeding compromised by (1) the fact the Board was counseled by an assistant attorney general, (2) the fact the case against Dr. Deatherage was presented to the Board by another assistant attorney general, and (3) the fact the presenting assistant attorney general was advised by a board member?

"Under the appearance of fairness doctrine, proceedings before a quasi-judicial tribunal are valid only if a reasonably prudent and disinterested observer would conclude that all parties obtained a fair, impartial, and neutral hearing." *Washington Med. Disciplinary Bd. v. Johnston*, 99 Wn.2d 466, 478, 663 P.2d 457 (1983). In *Johnston*, the court held that dual representation of the Board and the prosecution by a single assistant attorney general demonstrated no actual prejudice. However, "when the dual roles of the Attorney General present such a conflict, two separate attorneys should handle those functions." *Johnston*, 99 Wn.2d at 481. Here, separate assistant attorneys general represented the Board and the prosecution.

*Johnston* also discusses the propriety of the Board performing both prosecutory and adjudicatory functions. *Johnston*, 99 Wn.2d at 476. The court held this presented no due process violation, noting that "[t]he concentration

of functions in a single agency may be unfortunate and subject to much criticism, but where it has been designed by the Legislature and generally comports with notions of fairness and due process, it is almost uniformly upheld." *Johnston*, 99 Wn.2d at 477. Thus, Dr. Deatherage's complaint, without more, that his rights were violated when a Board member advised the assistant attorney general prosecuting the case against him is not persuasive.[7]

There was no appearance of fairness problem.

The Board's decision is reversed insofar as it concerns whether Dr. Deatherage acted unethically and unprofessionally in work he performed as an expert witness. The remainder of the Board's decision is affirmed.

Our holding does not require that we remand this case to the Board to reconsider its decision to revoke Dr. Deatherage's license for 10 years. In its order, the Board anticipated Dr. Deatherage would seek judicial review. It, therefore, "advise[d] the Court [of] the sanction which the Board would order for each of the . . .[ ]categories . . . ." It stated that even if the sole violation to survive judicial review was Dr. Deatherage's conduct concerning Witness F, it would still order his license revoked for 10 years.

SWEENEY, C.J., and THOMPSON, J., concur.

Review granted at 133 Wn.2d 1001 (1997).

---

[7]That Board member did not participate in the Board deliberations that considered whether Dr. Deatherage should be disciplined.