[No. 16263-6-II.   Division Two.   May 12, 1995.]

*In the Matter of the Detention of* R.R.

ROBERT T. SARGENT, ET AL, *Appellants*, v. R.R., *Respondent.*

*John A. McNeish* of *Department of Assigned Counsel* for respondent.

*Christine O. Gregoire, Attorney General,* and *Laura L. Wulf, Assistant,* for appellant

*David B. Robbins* on behalf of Washington Community Health Counsel and the Washington Association of County Designated Mental Health Professionals, amici curiae, for appellant.

ALEXANDER, J.* — The State of Washington appeals the Pierce County Superior Court's order dismissing its petition to revoke R.R.'s conditional placement at West End Outreach Services (West End), a community mental health center in Forks, Washington. The trial court dismissed the petition solely because it concluded that a prejudicial conflict of interest existed because the county designated mental health professional who ordered R.R.'s apprehension was also employed by West End, the agency providing R.R.'s case management service. We reverse, holding that in the absence of a finding of actual conflict or prejudice, the trial court erred in dismissing the petition.

On November 20, 1991, a Pierce County Superior Court commissioner ordered R.R. "detained" for 180 days as an outpatient under the supervision of the Clallam County Case Management Program at West End.[1] The conditions of the placement were that R.R. was to take medication as prescribed, cooperate with her treatment program, including "pre-approval of living arrangement", attend periodic treatment sessions, and refrain from threats and acts of harm to herself and others. The order also provided that if R.R. failed "to abide by these conditions the Mental Health Professional of Clallam County may arrange for [her] return to Western State Hospital for further disposition by the Court." Clerk's Papers, at 1.

On May 11 or 12, 1992, approximately 1 week before R.R.'s 180-day placement was to expire, two case managers at West End reported to a county designated mental health profes-

---

*Judge Gerry L. Alexander was a member of the Court of Appeals, Division Two, at the time oral argument was heard on this matter. He is now serving as a judge pro tempore of the court pursuant to CAR 21(c).

[1]This placement was a "less restrictive alternative", as authorized under either RCW 71.05.340(1)(a) or RCW 71.05.320(1). A placement pursuant to either statute is less restrictive than inpatient detention under RCW 71.05.150. See also footnote 5, supra.

sional (CDMHP) for Clallam County,[2] Bert Jackson, that R.R. had failed to comply with the conditions of her detention order. In an affidavit later submitted to the Pierce County Superior Court, one of the case managers claimed that R.R. violated the conditions of her placement in the following ways:

> 1) Refuses to see Dr. David Johnston for medication [management] 2) Refuses to follow [treatment] recommendations including — will not sign [treatment] plan, will not sign Day [treatment] agreement 3) Moved abruptly from residence with uncle . . . to Second St. House in Pt [sic] Angeles without prior approval 4) Has not consistently attended Day [treatment] 3x [weekly], including several weeks of no attendance 5) Appears poorly nourished and drives a vehicle while apparently psychotic and agitated, possibly jeopardizing her own safety and safety of others 6) Makes generalized threatening remarks, although she generally obscures the object of them.

Clerk's Papers, at 5 (Aff. of Marrianne Kennedy, West End Case Manager). At the time he received the case managers' report, Jackson was one of four CDMHP's employed by West End. He was also the coordinator of children and family services and a master clinician at West End. In the latter capacity, Jackson was the on-call emergency therapist that day.

On May 12, Jackson attempted to contact R.R. at her home. He was unable to make contact and, consequently, authorized her apprehension and detention.[3] Two days later, a Clallam County Sheriff's deputy made contact with R.R. at her home. The deputy brought her to Forks Community Hospital where a physician gave her a physical examination. Jackson then provided her with a statement of her mental

---

[2]A " 'County-designated mental health professional' means a person appointed by the county to perform the duties specified in chapters 71.05 [Mental Illness Involuntary Commitments] and 72.23 [Facilities for the Mentally Ill] RCW, and . . . [w]ho meets the educational and/or experience requirements as specified in WAC 275--55-020(33)". WAC 275-55-020(6), -020(6)(a). *See also* RCW 71.05.025, .050, .120, .150, .160, .170, .200, .210, .230, .290, .300, .320, .325, .340, .390.

[3]Jackson signed two "Authorizations" for R.R.'s apprehension and detention, the first was dated May 12, 1992, and the second was dated May 14, 1992. Both forms indicated that the detention was "pursuant to RCW 71.05.340 (suspension of conditional release)".

health proceedings rights, which she refused to sign.[4] Jackson also gave R.R. a mental status examination, concluding that

> she was not oriented to time or place, she was delusional in thought, she was experiencing some auditory hallucinations, she was really unaware, to the best of my knowledge, of who I was at that time and where she was in the hospital and of the conditions of [her supervised outpatient status], and I tried to explain that to her and read her rights. She was compliant. She continued to talk about hearing voices from God . . ..

Jackson then signed an authorization to transfer R.R. to Western State Hospital in Pierce County.

Three days later, a CDMHP for Pierce County, Dr. Sargent, petitioned the Pierce County Superior Court, on behalf of the State of Washington, to revoke R.R.'s outpatient status. Dr. Sargent also requested a hearing in superior court to determine

> whether [R.R. had] failed to adhere to the terms and conditions of [her] less restrictive placement, or [whether her] functioning has substantially deteriorated and whether [she] shall be returned for involuntary treatment on an inpatient basis, and at what facility, or whether the terms and conditions of release shall be modified.

On May 27, 1992, R.R. appeared with counsel at a hearing before a Pierce County Superior Court commissioner. At that hearing she sought dismissal of the petition, her attorney asserting that "absent an emergency situation, [CDMHP's] are not supposed to take someone into custody without having a Summons issued by a court commissioner or a judge" because CDMHP's are in a position where they are "both police and judges at the same time and that they are supposed to be neutral and impartial." R.R.'s attorney further argued that it was "completely inappropriate to have the county-designated mental health professional be em-

---

[4] The statement of rights provided to R.R. complies with the notice and statement of rights procedures for mental health detentions. *See* RCW 71.05.200. The statement includes references to rights similar to those in a *Miranda* warning, *see Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), and a description of the timing and purpose of the probable cause hearing.

ployed by and be supervised by the same person that supervises [her] case manager".

The commissioner granted R.R.'s motion and dismissed the petition to revoke her detention, saying that "I just don't think when someone's on the case load of [an] agency, someone in that agency can then be the mental health professional that makes the call on a detention or a revocation". The commissioner reasoned that a conflict of interest existed because "the law envisions a separation of the supervision duties and the evaluation duties for treatment or for detention or revocation." The State appeals.[5]

I

■■ We first discuss mootness. A case is moot when "the detention which is the subject of this appeal has already ended" and the court cannot "provide effective relief". *In re Cross*, 99 Wn.2d 373, 377, 662 P.2d 828 (1983). Although a court will not ordinarily consider a moot case, it may decide such a case to provide "an authoritative determination which will provide future guidance to public officers" when it involves a matter of "continuing and substantial public interest" which is likely to recur. *Cross*, 99 Wn.2d at 377 (quoting *Sorenson v. Bellingham*, 80 Wn.2d 547, 558, 496 P.2d 512 (1972)). The parties conceded at oral argument that R.R. is no longer being detained under the order at issue, and thus this case is moot. Nevertheless they both agree that the issue presented by the case is important and likely to recur. We are in accord and thus will address it.

II

■ The issue here is whether the Superior Court erred in concluding that Jackson's CDMHP duties and his private employment duties must be viewed as presumptively in conflict to the degree that they necessarily interfered with Jackson's ability to properly evaluate R.R.'s condition. We review

---

[5]There is nothing in the record to indicate that the State sought modification or revision of the commissioner's ruling by a superior court judge, pursuant to RCW 2.24.050.

de novo, because this is an issue of law. *Jones Assocs., Inc. v. Eastside Properties, Inc.*, 41 Wn. App. 462, 704 P.2d 681 (1985); *State v. McCormack*, 117 Wn.2d 141, 143, 812 P.2d 483 (1991), *cert. denied*, 502 U.S. 1111 (1992).

R.R. asserts that under Washington law a CDMHP must be neutral and impartial. She argues that the revocation of a conditional release is comparable to the proceedings for initial involuntary commitment, and that in neither case should the same persons be both treatment provider and judge of whether the patient should be involuntarily hospitalized. *See generally* RCW 71.05 (Mental Illness). Without citing authority, R.R. contends that "a clear bright-line rule is needed to avoid even the appearance of impropriety to those who both provide and receive mental health treatment in the community."[6]

R.R. contends that such a lack of neutrality existed, or at least appeared to exist, because of what she contends was an overlapping of Jackson's roles when he coincidentally served

---

[6]It is not clear from R.R.'s brief what legal basis her counsel relied on in advancing this contention. R.R.'s counsel alludes to "the appearance of impropriety" as a rationale. This seems to be an invitation to apply the appearance of fairness doctrine, which has been limited, in most respects, to the "quasi-judicial proceedings of legislative bodies". *In re Deming*, 108 Wn.2d 82, 105, 736 P.2d 639, 744 P.2d 340 (1987) (quoting *State Med. Disciplinary Bd. v. Johnston*, 99 Wn.2d 466, 483, 663 P.2d 457 (1983) (Utter, J., concurring)). We are thus reluctant to accept R.R.'s invitation to import wholesale the appearance of fairness doctrine into the mental health commitment field.

R.R.'s counsel also argued, for the first time on appeal, that under the analysis for reviewing the adequacy of due process articulated in *Mathews v. Eldridge*, 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976), Jackson's dual employment status violated R.R.'s constitutional due process rights. Although RAP 2.5(a) permits a party to raise for the first time on appeal a "manifest error affecting a constitutional right", that rule does not mandate appellate review of a newly raised argument where the facts necessary for its adjudication are not in the record and therefore where the error is not "manifest". *State v. Riley*, 121 Wn.2d 22, 31, 846 P.2d 1365 (1993). Here, the record from the trial court's consideration of the pretrial motion to dismiss the State's petition is devoid of the facts necessary for proper factual review required by *Mathews v. Eldridge, supra.* For this reason, and because R.R. is not a criminal defendant and her constitutional argument does not involve a matter affecting the jurisdiction of the trial court, we decline to address whether the due process afforded to R.R. was adequate under *Mathews v. Eldridge, supra. See Robinson v. Peterson*, 87 Wn.2d 665, 675, 555 P.2d 1348 (1976).

as both the on-call therapist for West End as well as the CDMHP for Clallam County. To support her contention she points to a portion of Jackson's testimony at trial to support her argument that Jackson's dual responsibilities created a conflict of interest:

I was the on-call therapist who was alerted by Mary Ann Kennedy and Karen Timbers, who are [R.R.]'s case managers in the adult day treatment facility. And *we've* been actually monitoring her progress or deterioration the last several months, and then they brought this [R.R.'s failure to attend scheduled sessions] to my attention, . . . and that's when I initiated the order for apprehension at that point.

Br. of Resp't, at 6 (quoting Report of Proceedings, at 5).

The State's position is that an irresolvable conflict of interest was not created merely because Jackson was employed by the same community mental health agency that provided R.R. with case management services. The State contends that neither "overlapping of roles or adverse interest has been shown in this case". The State supports its position by arguing that Jackson works in a different division of West End than R.R.'s case managers. It also points out that he had no professional responsibility for R.R.'s treatment or care.

■ R.R. is correct in observing that the mental health commitment statutes and fundamental concepts of justice require that mental health commitment decisions be made in a neutral and impartial atmosphere. However, she is incorrect insofar as she concludes that the employment arrangement that existed here, by itself, demonstrated that Jackson was not neutral and impartial. We believe that the burden of proof to show a conflict of interest in a proceeding for the revocation of a conditional release should rest with the person claiming a conflict. A bare allegation of a conflict of interest is insufficient to justify dismissal of a petition for revocation of a conditional release, where the question is whether the conditionally released person is adhering to conditions of release. *See State Med. Disciplinary Bd. v. Johnston*, 99 Wn.2d 466, 483, 663 P.2d 457 (1983) (Utter, J., concurring). To hold otherwise would contradict the judicially declared preference for deciding involuntary treatment issues on their merits. *In re G.V.*, 124 Wn.2d 288, 296, 877 P.2d 680 (1994).

A CDMHP is statutorily authorized to order the apprehension of a conditionally released person "upon notification by the hospital or facility designated to provide outpatient care, or on his or her own motion", when either that facility or the CDMHP "determines that a conditionally released person is failing to adhere to the terms and conditions of his or her release". RCW 71.05.340(3).[7] The language of RCW 71.05-.340(3) does not imply or require that the CDMHP make an independent assessment of the truth or falsity of the determination that the person is not adhering to those conditions. Contrary to the argument advanced by R.R.'s counsel on appeal, this statute does not require the CDMHP to comply with the more extensive procedures that apply when the CDMHP evaluates whether to petition for the initial detention of a gravely disabled person under RCW 71.05.150.

In *Johnston*, the Supreme Court addressed an issue similar to that which we are confronting here. In that case, the court addressed whether the combination of investigative and adjudicative or quasi-adjudicative functions prompted the invocation of the appearance of fairness doctrine, and concluded that:

> [t]he bare fact that the same administrative adjudicators also are clothed with investigative powers does not mean the case will be decided on an improper basis or that there will arise a prejudgment on the ultimate issues. We must presume the board members acted properly and legally performed their duties until the contrary is shown. We are convinced the mere combination of adjudicative and investigative powers in one agency, without more, would not be viewed by a reasonably prudent and disinterested observer as denying any party a fair, impartial, and neutral hearing.

(Citations omitted.) *Johnston*, 99 Wn.2d at 479-80.

---

[7]The grounds and procedures for the revocation of a less restrictive alternative are the same as those for revocation of a conditional release. RCW 71.05.340(5). *See also* MPR 4.2. Petitions filed in Clallam County Superior Court by the state in this case seem to indicate that R.R. was "conditionally released" to the outpatient care of West End. RCW 71.05.340(1)(a). However, the petition filed in Pierce County Superior Court was denominated a petition for revocation of a less restrictive placement. "[L]ess restrictive treatment" is an undefined phrase that is referred to in RCW 71.05.320(1) (treatment of developmentally disabled person deemed incompetent pursuant to RCW 10.77.090(3)). Treatment authorized under RCW 71.05.320(1), which is to be less restrictive than involuntary detention, may include conditions. RCW 71.05.320(1).

While the medical discipline proceedings in *Johnston* are factually distinguishable from the involuntary recommitment proceedings here, the presumption that an official legally performs his or her duties is, in our judgment, equally applicable to the determination of whether a conditionally released mental patient is adhering to the conditions of his or her release. *See, e.g., State v. Johansen*, 125 Or. App. 365, 378, 866 P.2d 470, 477 (1993) ("the possibility that there may occasionally be an improper recommitment does not afford a rational predicate for striking down the entire recommitment scheme, for [s]uch cases, if they are found, can be dealt with individually") (quoting *Parham v. J.R.*, 442 U.S. 584, 616, 61 L. Ed. 2d 101, 99 S. Ct. 2493, 2511 (1979)), *review denied*, 319 Or. 572 (1994).

In conclusion, we hold that, absent a finding that a prejudicial conflict of interest actually existed, it was error for the Superior Court commissioner to dismiss the State's petition simply because of the alleged or implied conflict of interest.

Reversed.

SEINFELD, C.J., and MORGAN, J., concur.