

THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Detention of | ) | |
| | ) | No. 40409-9-III |
| C.E.,[†] | ) | |
| | ) | |
| Respondent. | ) | PUBLISHED OPINION |

STAAB, J. — This appeal concerns the boundaries of a superior court's authority under Washington's Involuntary Treatment Act (ITA), ch. 71.05 RCW, to direct the Developmental Disabilities Administration (DDA), a subagency of the Department of Social and Health Services (DSHS), to take specific actions under the Developmental Disabilities Act, Title 71A RCW, in connection with a patient subject to involuntary civil commitment.

At a hearing for recommitment, several witnesses testified that C.E., a person diagnosed with developmental disabilities, remained in need of continued confinement but had made dramatic improvements during her three years of involuntary commitment. Witnesses testified that she was stable in her treatment and would benefit from less

---

[†] To protect the privacy interests of C.E., we use his/her initials throughout this opinion. General Court Order for Court of Appeals, *In re Changes to Case Title*, (Wash. Ct. App. May 25, 2017), http://www.courts.wa.gov/appellate_trial_courts /?fa=atc.genorders_orddisp&ordnumber=2017_002&div=III.

restrictive alternatives to treatment. Nevertheless, because C.E. had been previously placed in DDA's Community Protection Program (Program), an alternative program for persons who need enhanced supervision but pose a physical risk to others, C.E.'s discharge options were severely limited. While C.E.'s treatment team questioned whether her placement in the Program was still appropriate, the court was advised that she could not graduate from the Program or be reassessed while she remained in custody, but she could not leave custody because the Program restricted her housing options.

The superior court granted the petition for recommitment but ordered a less restrictive alternative treatment. Recognizing that C.E.'s designation in the Program was resulting in her perpetual commitment, and in an effort to effectuate its less restrictive alternative order, the court ordered DDA to reassess C.E.'s designation in the Program to determine if C.E. could qualify for additional discharge options.

DDA appeals this order, arguing that the superior court exceeded its subject matter jurisdiction and authority by directing actions under Title 71A RCW during an involuntary commitment proceeding under ch. 71.05 RCW. DDA characterizes the court's actions as judicial review of agency decisions, which, it contends may occur only through the Administrative Procedure Act (APA), ch. 34.05 RCW. Because C.E. did not challenge the prior "Community Placement Program" assessment through an APA petition, and because ch. 71.05 RCW does not expressly authorize judicial oversight of DDA determinations, DDA argues the court lacked authority to enter the contested order.

2

We conclude that the superior court was not reviewing or overturning a final agency action but instead was acting within its original subject matter jurisdiction under the ITA, ch. 71.05 RCW. The superior court had the authority and the obligation to ensure the enforceability of its less restrictive alternative order. The court's order simply ensured that DDA reengaged its own assessment and placement processes in light of current clinical information. Finding no error, we affirm.

BACKGROUND

*DDA Services and C.E.'s CPP Status*

C.E. is an individual who has been diagnosed with both an intellectual disability as well as psychiatric disorders and is receiving services from DDA under Title 71A RCW. Her medical history includes over 30 psychiatric hospitalizations. A guardian was appointed to make decisions on her behalf, including those related to DDA services.

In 2016, C.E. was admitted and later discharged from Eastern State Hospital (Hospital) after it was determined that a less restrictive alternative treatment through DDA was in her best interest. She was transferred to Lakeland Village, a residential habilitation center[1] for individuals with developmental disabilities, where she remained until October 2021. At that time, she was readmitted to the Hospital following incidents of assaultive and aggressive behavior toward her caregivers.

---

[1] Residential habilitation centers are structured as small communities with staff-supported cottages.

Around the time of her readmission, DDA determined that C.E. posed a risk to the community and classified her in the Program, which provides the highest level of supervision for individuals deemed a risk to public safety. *See* RCW 71A.12.200. Placement in the Program significantly limits available housing options, as many community settings—including adult family homes—do not accept individuals in the Program. After returning to the Hospital, C.E. was diagnosed with, an unspecified psychotic disorder, post-traumatic stress disorder, intellectual disability, and borderline personality disorder.

*Involuntary Commitment Proceedings*

In January 2024, the Hospital filed a petition[2] in Spokane County Superior Court seeking to recommit C.E. for an additional 180 days of involuntary inpatient treatment under the ITA. By the time of the hearing on the petition, C.E.'s diagnoses had been updated to bipolar II disorder, mild intellectual disability, and post-traumatic stress disorder.

Present at the hearing were the DDA mental health liaison, C.E.'s attending psychiatrist, C.E.'s social worker, and counsel for both C.E. and the Hospital. C.E.'s guardian did not appear at the hearing.

---

[2] The record does not contain a copy of the petition, or any details regarding who filed it and their argument in support. C.E.'s lawyer asked the court to deny the petition.

DDA's mental health liaison testified first. She regularly worked with C.E. to assist her with placement options but noted C.E.'s options for placement were limited by her Program classification. For example, it was DDA's policy that adult family homes were not an option for C.E. due to her classification in the Program. The only way to get out of the Program was to graduate, get reassessed, or decline the assistance. The liaison testified that it was not possible for C.E. to graduate from the Program while she was hospitalized. If an updated assessment determined that C.E. no longer posed a risk to the community, she could potentially be discharged from the Program. Otherwise, if C.E. were to decline community protection, her only option would be independent living in her own apartment.

The liaison testified that the two options available to C.E. given her current needs were supported living and residential habilitation centers. Despite sending numerous referral packets to supported living providers, the liaison had been unable to secure placement. Additionally, of the three residential habilitation centers in the state, two of them had denied C.E.'s applications, leaving only Lakeland Village as an option. The liaison admitted that C.E. had expressed reservations about returning. The liaison was also aware that C.E. had previously assaulted a staff member there.

C.E.'s attending psychiatrist testified that C.E. had made significant progress in her treatment; her mood had stabilized, and she understood her updated diagnosis and need for medication. The psychiatrist noted that C.E. had engaged in some self-harming

behavior. According to the psychiatrist, C.E. could be considered for discharge when she demonstrated four weeks without aggressive behavior, achieved psychiatric stability, and had a viable discharge plan. He testified that, at the time of the hearing, C.E. met approximately 90 percent of the discharge criteria.

The psychiatrist went on to testify that DDA was pursuing a discharge plan that C.E.'s treatment team did not support. He noted that discharge to Lakeland Village would be "tragic," posing a risk to C.E. and the staff. He added that C.E. was experiencing increased stress related to the possibility of being returned to Lakeland Village, and that her treatment team did not support that placement. The psychiatrist testified that he supported releasing C.E. to an adult family home or residential-type treatment center. He did not support release to the community either unconditionally or on a less restrictive alternative treatment.

C.E.'s psychiatric social worker, who was part of C.E.'s treatment team, testified that she served as the primary point of contact between the treatment team and DDA. She emphasized that C.E. is doing very well and has been for a long time. She testified that the discharge plan for C.E. involved identifying a facility within the Program that was accepted by DDA.

The social worker testified that in an effort to find C.E. viable living arrangements, numerous referral packets were sent to facilities across Washington State. While DDA

did not let her know the exact number, she could count at least 61 packets having been sent out. Of those 61 referral packets, 31 facilities declined and 30 did not respond.

According to the social worker, DDA considered Lakeland Village a viable placement option for C.E. even though the treatment team did not support this option, and the mere possibility of discharge to Lakeland Village was causing C.E. increased anxiety. She also noted that while other viable facilities existed outside the DDA system, C.E. was not eligible for them due to her enrollment in the Program. In light of the rejected referral packets, C.E.'s ineligibility for an adult family home, rejection by two of the three residential treatment centers, and Lakeland Village's incompatibility, the social worker was not sure what DDA was planning for C.E.'s discharge but noted that DDA was taking the lead on discharge planning.

Regarding the Program, the social worker testified that C.E.'s last assessment was completed in 2020 when she was admitted into the Program. She believed a new assessment would be beneficial due to C.E.'s progress but noted that the social worker's prior request for a reassessment was denied by DDA "because [C.E.] hasn't been in the community" and therefore DDA did not think anything had changed. Clerk's Papers (CP) at 111, 114. The social worker indicated that the process for a new assessment would include sharing her notes with the DDA psychologist who would process the assessment internally and prepare a new recommendation. She noted that if C.E. was not in the Program, her options for placement would increase significantly.

7

C.E. testified briefly and stated she did not want to remain at the Hospital and would go to a shelter if discharged.

In closing, the Hospital's attorney requested the court grant the petition but noted that it would move for a less restrictive alternative if a viable placement became available. C.E. opposed the petition or, alternatively, sought a less restrictive alternative. Her attorney pointed out that under the circumstances, it could be years before a placement alternative became available for C.E.: "With the [P]rogram that she is in, it's possible that she will not—it's possible that she cannot get out of the [Program] unless she's in the community. And she can't be in the community because she's in that [P]rogram; there are no placements available." CP at 136.

*The Superior Court Commissioner's Order*

A superior court commissioner granted the petition for 180 days of involuntary impatient treatment at the Hospital, finding that C.E. was gravely disabled. The commissioner also found that discharge to a less restrictive treatment alternative would generally be in C.E.'s best interest, but that no viable setting was available at that time. The commissioner further found that C.E.'s Program classification was "stale and no longer appropriate" as the last assessment was conducted approximately four years earlier, in 2020. CP at 5.

The commissioner concluded the court had subject matter jurisdiction and personal jurisdiction over DDA and the Hospital as subagencies of DSHS, and issued an

order under the ITA, ch. 71.05 RCW, directing DDA to take several actions under Title 71A RCW. The order required DDA to conduct a new Program assessment within 14 days, consult with C.E.'s treatment team at the Hospital, resend service referrals after the new Program assessment, and arrange for C.E.'s discharge to a residential habilitation center or adult family home within 60 days. The order barred placement at Lakeland Village except as a last resort, to be used only if DDA and the Hospital could objectively demonstrate that no other options were available. Citing *In re Detention of J.S.*, 124 Wn.2d 689, 880 P.2d 976 (1994), and legislative intent from the ITA, the commissioner concluded that the court had broad authority to order this less restrictive alternative.

*DDA's Motion for Revision*

DDA moved for revision of the order, arguing that the superior court lacked authority and jurisdiction to review DDA's service decisions under Title 71A RCW in a hearing governed by the ITA. It asserted that "[d]ecisions by the Department in implementing and administering its Medicaid program are unquestionably 'agency actions' that are not subject to ITA proceedings under [c]hapter 71.05 [RCW]." CP at 13. Instead, it argued that any review of DDA service decisions must proceed through the APA.

A superior court judge denied the motion for revising and adopted the commissioner's findings and conclusions, with the following additional findings:

9

1. Superior Courts have personal jurisdiction and authority to direct Department of Social and Health Services' agency actions for the provision of public benefits under RCW 71A, RCW 74.08, RCW 74.09, and federal Medicaid law in the manner directed by paragraph 15 of the Court's January 12, 2024 order pursuant to RCW 71.05 and *In [re] the . . . Detention of J.S.*

2. The Court's directions to DDA to in Paragraph 15(A)-(D), including the directions to re-assess [C.E.] in consultation with Eastern State Hospital employees notwithstanding DDA's policies, to resend referrals for services to providers, and that Lakeland Village be the discharge location of last resort are within the Court's authority under RCW 71.05 and are not too specific under *In [re] the . . . Detention of J.S.*

3. The Court has authority to and waives the requirements of the Administrative Procedure Act, RCW 34.05, pursuant to RCW 34.05.534(3)(c). [C.E.] would be subject to grave irreparable harm if required to comply with the Administrative Procedure Act.

4. Paragraph 15(C), requiring [C.E.] to be discharged to an adult family home or residential habilitation center within 60 days, is subject to DDA finding her eligible for services in those settings pursuant to state and federal Medicaid law.

CP at 156-57.

DDA timely appeals.

ANALYSIS

DDA contends that the superior court's order exceeded the court's subject matter jurisdiction and statutory authority in an involuntary treatment proceeding under ch. 71.05 RCW. Specifically, DDA argues the court exceeded its jurisdiction because it effectively reviewed agency actions governed by Title 71A RCW, which are subject to the procedural requirements of the APA and for which the superior court only has

appellate jurisdiction. Because no APA petition was filed, DDA argues the court lacked authority to issue its order.

In response, C.E. maintains that the court acted within its authority under RCW 71.05.320 to enter and implement a less restrictive treatment alternative. She argues that the court was not reviewing an agency action subject to the APA and instead exercised original subject matter jurisdiction to give effect to its less restrictive alternative determination. Even if APA procedures were relevant, C.E. argues that the court lawfully waived exhaustion under RCW 34.05.534(3)(c).

We conclude the superior court did not exceed its authority under the ITA, ch. 71.05 RCW, or act outside of its jurisdiction and affirm.

1. *Standard of Review*

Under RCW 2.24.050, commissioner rulings are subject to revision by the superior court. On a motion to revise, "the superior court reviews both the commissioner's findings of fact and conclusions of law de novo based upon the evidence and issues presented to the commissioner." *State v. Ramer*, 151 Wn.2d 106, 113, 86 P.3d 132 (2004). "The superior court's decision to accept or revise the commissioner's decision then becomes the decision of the court." *In re Parentage of Hilborn*, 114 Wn. App. 275, 278, 58 P.3d 905 (2002). On appeal, this court reviews the superior court's decision, not the commissioner's. *In re Marriage of Stewart*, 133 Wn. App. 545, 550, 137 P.3d 25

11

(2006).  We review issues of law de novo.  *In re Det. of R.R.*, 77 Wn. App. 795, 799-800, 895 P.2d 1 (1995).

2.  *Legal Framework*

a)  *Agency Action Under Title 71A.10 RCW and the APA*

DDA administers long-term care services to eligible individuals with developmental disabilities, including through the Program, which serves individuals who pose a risk to themselves or others.  *See* RCW 71A.12.200.  To receive services under the Program, an individual must undergo a risk assessment conducted by a qualified DDA professional.  WAC 388-831-0050.  Once enrolled, the individual's progress must be reviewed every 90 days, and the treatment team may request a reassessment at any time. WAC 388-831-0200.  If a Program enrollee demonstrates success with reduced restrictions and remains free of offenses indicating relapse for at least 12 months, the individual may be considered for placement in a less restrictive residential setting.  WAC 388-831-0220.

DDA decisions affecting eligibility for services, Program enrollment, or level of restriction constitute agency action under the APA.  *See* RCW 71A.10.050(1), .12.240(1)(b), (2), (4).  The APA also defines "agency action" broadly to include "the granting or withholding of benefits."  RCW 34.05.010(3).  Judicial review of such agency actions is governed exclusively by the APA unless another statute expressly authorizes de novo review.  RCW 34.05.510(3); *see also* RCW 71A.10.050(1), .12.240(1).  When an

agency decision falls within the definition of "agency action," the court's review is generally limited to that which is provided under RCW 34.05.570 (governing judicial review of agency actions) and RCW 34.05.574 (governing the types of relief a court may grant when reviewing an agency action).

In general, a party must exhaust all available administrative remedies before seeking relief from an agency action in superior court. *See* RCW 34.05.534; *Citizens for Mount Vernon v. City of Mount Vernon*, 133 Wn.2d 861, 866, 947 P.2d 1208 (1997). However, a court may relieve a petitioner from the exhaustion requirement if "grave irreparable harm that would result from having to exhaust administrative remedies would clearly outweigh the public policy requiring exhaustion of administrative remedies." RCW 34.05.534(3)(c).

Importantly, when reviewing agency action under the APA, the superior court acts under its appellate jurisdiction, not under its general or original jurisdiction. *Diehl v. W. Wash. Growth Mgmt. H'rgs Bd.*, 153 Wn.2d 207, 216, 103 P.3d 193 (2004). "'When reviewing an administrative decision, the superior court is acting in its limited appellate capacity, and all statutory procedural requirements must be met before the court's appellate jurisdiction is properly invoked.'" *Union Bay Pres. Coal. v. Cosmos Dev. & Admin. Corp.*, 127 Wn.2d 614, 617, 902 P.2d 1247 (1995) (quoting *City of Seattle v. Pub. Emp't Relations Comm'n*, 116 Wn.2d 923, 926, 809 P.2d 1377 (1991). These jurisdictional requirements cannot be waived by any party, and "'[a] court lacking

jurisdiction must enter an order of dismissal.'" *Stewart v. Dep't of Emp. Sec.*, 191
Wn.2d 42, 53, 419 P.3d 838 (2018) (quoting *Conom v. Snohomish County*, 155 Wn.2d
154, 157, 118 P.3d 344 (2005)).

### b) *Chapter 71.05 RCW—The ITA*

By contrast, this case arose under ch. 71.05 RCW, the ITA, which governs civil
commitment proceedings for individuals with behavioral health disorders. The chapter
provides procedures for determining whether commitment is necessary and if so, whether
the court should order involuntary inpatient treatment or a less restrictive treatment
alternative. *See* RCW 71.05.320 (governing remand of patient for involuntary
commitment and less restrictive treatment alternatives); *see also* RCW 71.05.280
(governing grounds for additional commitment).

Unlike proceedings under the APA, the superior court has original subject matter
jurisdiction and authority to entertain an involuntary commitment petition and
proceeding. *See* WASH. CONST. art. IV, § 6 ("The superior court shall also have original
jurisdiction in all cases and of all proceedings in which jurisdiction shall not have been
by law vested exclusively in some other court."); *see generally* RCW 71.05.320.

The legislature has explicitly articulated its intent for the ITA: timely access to
appropriate treatment, protection of individual rights, promotion of community-based
services, and avoidance of unnecessary institutionalization. *See* RCW 71.05.010, .012.

Under ch. 71.05 RCW courts are mandated to consider less restrictive treatment

alternatives and the chapter encourages the use of less restrictive treatment.

> The Legislature has emphasized the importance of less restrictive treatment
> and has, in fact, directed the court to consider less restrictive treatment at
> each stage of involuntary commitment proceedings. *Restricting the court's
> ability to order less restrictive treatment would not be consistent with this
> clear legislative intent.*

*J.S.*, 124 Wn.2d at 698 (emphasis added).

*3. Analysis*

This case concerns the interplay between superior court authority under

Washington's ITA, ch. 71.05 RCW, and DDA's autonomy as an administrative agency

governed under Title 71A RCW and the APA, ch. 34.05 RCW.  Specifically, the issue is

whether the superior court exceeded its authority and acted outside of its jurisdiction in

ordering DDA to reassess C.E.'s status in the Program, consult with clinical staff, and

pursue discharge in a residential habilitation center or adult family home.

We conclude the superior court properly exercised its original subject matter

jurisdiction under the ITA, ch. 71.05 RCW, when it entered and implemented a lawful

less restrictive treatment alternative for C.E.  The court did not engage in judicial review

of an agency action, nor did it exceed its authority by directing reassessment or

placement actions by DDA.  Because no final agency decision was before the court, and

because the court was not acting in an appellate capacity under the APA, ch. 34.05 RCW,

the procedural requirements of the APA, including exhaustion, were inapplicable.  The

15

trial court's order was consistent with the legislative purpose of the ITA and appropriately tailored to ensure that C.E.'s less restrictive alternative could be meaningfully effectuated.

### a) The superior court acted within its original subject matter jurisdiction and authority under ch. 71.05 RCW[3]

DDA argues that the superior court lacked subject matter jurisdiction because it effectively conducted judicial review of agency action governed by Title 71A RCW and the APA, ch. 34.05 RCW. This argument, however, mischaracterizes both the nature of the proceeding and the scope of the court's order.

This case did not arise from a petition for judicial review under the APA. There was no final agency decision before the court under RCW 34.05.570, nor was the court asked to overturn or review any specific agency determination. Instead, the court was exercising its original subject matter jurisdiction under ch. 71.05 RCW—specifically, its authority to conduct involuntary treatment proceedings and, where appropriate, to order a less restrictive treatment alternative under RCW 71.05.320.

---

[3] For clarity, "original subject matter jurisdiction" refers to a court's ability to entertain a case. *In re Marriage of Buecking*, 179 Wn.2d 438, 453, 316 P.3d 999 (2013). "A court has subject matter jurisdiction where it has authority 'to adjudicate the type of controversy involved in the action.'" *In re Marriage of McDermott*, 175 Wn. App. 467, 480-81, 307 P.3d 717 (2013) (quoting *Shoop v. Kittitas County*, 108 Wn. App. 388, 393, 30 P.3d 529 (2001)). Separately, "the superior court is a court of general jurisdiction," and such a court may render judgment at any time except as forbidden by law. *State v. Dooly*, 14 Wn.2d 459, 467, 128 P.2d 486 (1942).

Having found that C.E. remained gravely disabled but no longer required inpatient care, the superior court entered a less restrictive treatment order. In doing so, it directed DDA to reassess C.E.'s status in the Program using updated clinical input and, subject to DDA finding C.E. eligible for services and pursuant to state and federal Medicaid law, to pursue placement options in a residential habilitation center or adult family home. These directives did not adjudicate any agency action under Title 71A RCW or compel any specific service outcome. And contrary to DDA's argument, the order did not require an assessment by an unqualified individual or require DDA to act in a manner inconsistent with state or federal law. Rather, the order for reassessment was designed to facilitate the court's own less restrictive alternative order—a remedy expressly authorized under the ITA. *See* RCW 71.05.320.

The court thus acted under its original subject matter jurisdiction, not its appellate jurisdiction. This distinction is dispositive. The APA's procedural framework—including exhaustion and petition requirements—applies only when a court reviews "agency action" under RCW 34.05.570. Because the superior court was not sitting in its appellate capacity, the APA's jurisdictional limitations and procedural requirements do not apply here.

   b) *The superior court did not engage in judicial review of an agency action*

DDA contends that the superior court engaged in improper judicial review by directing a new Program assessment and setting a 60-day placement timeline, claiming

this fell within the APA's definition of reviewing the "granting or withholding of benefits." RCW 34.05.010(3). But at the time of the hearing, DDA had not issued any final decision denying a benefit or service under RCW 34.05.010(3); RCW 71A.10.050(1)(g); or RCW 71A.12.240(1).

The superior court's order did not invalidate a prior agency decision, nor did it compel DDA to approve a particular service or eligibility outcome. Instead, it required DDA to engage its own internal reassessment process using current clinical information—something that, according to the DDA mental health liaison's testimony, was becoming more common under updated agency practices. The liaison testified that agency policy had recently shifted toward encouraging more frequent reassessments. Furthermore, the order explicitly conditioned any discharge on C.E.'s eligibility under state and federal Medicaid law, preserving DDA's role in determining services.

In substance, the superior court acted within its authority under ch. 71.05 RCW to ensure that a lawful less restrictive alternative could be implemented. It did not displace DDA's discretion over eligibility, service provision, or provider participation. Accordingly, the court's order did not constitute judicial review of agency action and was not subject to the procedural requirements of the APA.

c) *The APA does not apply, so waiving the exhaustion requirement was unnecessary*

DDA argues that the superior court erred in invoking RCW 34.05.534(3)(c) to excuse compliance with the APA, asserting that the exhaustion waiver provision does not permit a court to disregard the APA's other procedural requirements or to act outside its limited appellate jurisdiction. But that argument is misplaced where the APA does not apply in the first place.

As discussed above, the superior court was not reviewing a final agency action under Title 71A RCW or exercising appellate jurisdiction under the APA. Rather, it was acting within its original subject matter jurisdiction under RCW 71.05.320 to enter and effectuate a less restrictive alternative. Because no final agency action was before the court, and because the court was not sitting in its appellate capacity, the APA's exhaustion and procedural requirements did not apply.

The court's reference to waiver under RCW 34.05.534(3)(c) was therefore unnecessary—though, notably, it was supported by the record. C.E.'s treating professionals testified that her continued hospitalization, caused in part by the lack of an updated Program assessment, posed a serious risk of grave and irreparable harm to her health and well-being.

   *d) The superior court's order did not run afoul of* In re Detention of J.S.

DDA argues that the superior court's order went further than what the Washington

Supreme Court permitted in *In re Detention of J.S.*, 124 Wn.2d 689, and that, even if *J.S.*

remains good law,[4] it does not authorize courts to compel agency action or override

programs administered under Title 71A RCW. We disagree with this argument.

   In *J.S.*, the Washington Supreme Court reviewed three consolidated civil

commitment cases involving the involuntary treatment of adults with developmental

disabilities. Particularly relevant to this appeal was the petition of C.P., who had been

diagnosed with developmental disabilities and organic personality disorders that caused

C.P. to present a likelihood of harm to others. Appellant's Br. at *5; *In re Det. of J.S.,* No.

61551-9 (Wash. Sept. 22, 1994). C.P.'s case manager testified that while Western State

Hospital was not the optimum placement for C.P., there were no other alternatives. C.P.'s

behavior ruled out placement in a group home or congregate care facility, the residential

treatment facilities did not have openings, and there were no funds to create an "Intensive

Treatment Support" placement. Appellant's Br. at *6, No. 61551-9.

---

   [4] DDA argues that "it is not clear whether the analysis in *J.S.* is still good law" due to amendments to ch. 71.05 RCW. Appellant's Br. at 43-44. But DDA cites no authority that *J.S.* or any of its holdings have been overruled. Thus, the case continues to bind this court.

In each case, the trial court found that the respondents remained gravely disabled and needed continued confinement but that less restrictive treatment alternatives were in their best interest. 124 Wn.2d at 696. The trial court ordered that each respondent should be removed from the hospital and placed in less restrictive treatment over the State's protest that such placements were not available due to funding allocations. *Id.* at 698.

The *J.S.* court emphasized that while trial courts may order treatment in a less restrictive setting, they may not dictate placement at a specific facility. *See id*. at 696-98. Only one portion of one order—requiring temporary placement at Rainier School, a particular DDA facility—was found to be impermissibly specific. *Id*. at 696-97. The other orders, which simply directed removal from the hospital to an appropriate less restrictive community setting, were upheld. *Id*.

Nevertheless, in *J.S.* the State maintained that the trial court's order requiring less restrictive treatment improperly required the State to incur expenditures beyond appropriations and was an attempt "to modify policy choices made at the legislative level." *Id.* at 698. The court disagreed, noting that under ch. 71.05 RCW,

> [t]he Legislature has granted the court the power to determine the best interests of the individual and in so doing, to consider less restrictive treatment. The statutory framework represents a legislative policy choice to create this role for the court. *We find that because the court has the power under the statute to order less restrictive treatment, it necessarily has the power to compel compliance with its order.*

*Id.* at 699 (emphasis added).

Here, the superior court's order did not require specific treatment, specific placement, or even a specific outcome; it simply required DDA to reassess whether C.E.'s continued placement in the Program was appropriate in light of the change in circumstances since she was last evaluated. The court found that the reassessment was necessary to compel compliance with its order for less restrictive treatment because DDA had a policy of not performing reassessments so long as a person was committed to a hospital, but C.E. had no options for placement outside the hospital so long as she remained in the Program. The result was C.E.'s perpetual commitment contrary to the legislative intent to consider and impose less restrictive treatment and avoid unnecessary institutionalization.

Importantly, the court's order preserved and respected DDA's authority to determine eligibility, make referrals, and coordinate with providers. The court did not direct any particular outcome or override agency rules. The court simply ensured that its own less restrictive alternative order—authorized by RCW 71.05.320—could be carried out in a manner responsive to C.E.'s current clinical needs.

To the extent DDA reads *J.S.* as barring any coordination between the court and DDA under ch. 71.05 RCW, that interpretation overstates the case's reach. *J.S.* bars courts from mandating a specific placement outcome, not from taking reasonable steps to ensure that a less restrictive alternative the court is statutorily authorized to order can be meaningfully effectuated. Here, the court directed a reassessment—not a particular

22

result. If, after that reassessment, DDA determines that C.E. remains a community risk, her Program status and institutional placement will continue. The court's order thus preserved the agency's decisional authority and merely removed outdated barriers to consideration of appropriate community options.

We also reject DDA's argument that the superior court failed to consider other laws and regulations. The court's order requiring C.E. to be discharged to an adult family home or residential habilitation center within 60 days was subject to DDA finding eligible services pursuant to state and federal Medicaid laws. DDA fails to point to any authority, other than its own policy, which prevents reassessment while a person is in custody.

This narrow tailoring highlights the legality of the superior court's approach and its consistency with legislative intent. The legislative intent statutes explicitly state the legislature's preference for timely, community-based treatment whenever appropriate, and directs courts to avoid unnecessary institutionalization, safeguard individual rights, and promote continuity of care. RCW 71.05.010(1) (legislative intent); RCW 71.05.012 (legislative intent and finding). The court's order here reflects that intent. It was grounded in uncontroverted clinical testimony that C.E. no longer required hospital-level care and that her outdated Program classification was the main barrier to community placement. In directing a reassessment and conditioning discharge on eligibility, the

23

No. 40409-9-III
*In re Det. of C.E.*

court acted within its authority under RCW 71.05.320 to ensure its less restrictive alternative order could be meaningfully implemented.

The superior court did not exceed its authority or act outside of its jurisdiction in directing DDA to take certain actions necessary to effectuate its less restrictive alternative order.

Affirmed.

_____
Staab, J.

WE CONCUR:

_____
Cooney, J.

_____
Lawrence-Berrey, C.J.

24